1  Clifford R. Horner, Esq., State Bar No. 154353
   Brendan J. Dooley, Esq., State Bar No. 162880
2  **HORNER LAW GROUP, PC**
   800 S. Broadway., Suite 200
3  Walnut Creek, California 94596
   Telephone:    (925) 943-6570
4  Facsimile:    (925) 943-6888
   chorner@hornerlawgroup.com
5  bdooley@hornerlawgroup.com

6  Attorneys for Plaintiff,
   CANDID VENTURES, LLC, an Ohio limited
7  Liability company [f/k/a AnuPriya, LLC]

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11 CANDID VENTURES LLC, an Ohio limited      Case No.
   liability company [f/k/a ANUPRIYA, LLC],
12                                            **VERIFIED COMPLAINT FOR:**
               Plaintiff,
13 v.                                         1.  **TEMPORARY RESTRAINING
                                                  ORDER;**
14 DEW VENTURES, INC., a California           2.  **PRELIMINARY AND
   corporation; SURESH DEOPURA; an               PERMANENT INJUNCTION;**
15                                            3.  **DECLARATORY JUDGMENT;**
   individual; FEATHERSUP INDIA PVT. LTD;     4.  **TORTIOUS INTERFERENCE
16 an entity of unknown form; and DOES 1 – 100,   WITH CONTRACT;**
   inclusive.                                 5.  **VIOLATION OF CALIFORNIA
17                                                TRANSACTION UNIFORM
               Defendants.                        VOIDABLE ACT (CAL. CIVIL
18                                                CODE §3439, ET SEQ.);**
                                              6.  **BREACH OF FIDUCIARY
19                                                DUTIES;**
                                              7.  **CONSPIRACY;**
20                                            8.  **AIDING AND ABETTING;**
                                              9.  **RECEIVING AND/OR
21                                                CONCEALING STOLEN
                                                  PROPERTY (CAL. PEN. CODE
22                                                SECTION 496(c));**
                                              10. **CONVERSION (DERIVATIVE);**
23                                            11. **CONVERSION;**
                                              12. **VIOLATION OF CAL. BUS. &
24                                                PROF. CODE 17200 UNFAIR
                                                  COMPETITION IN VIOLATION
25                                                OF CALIFORNIA BUSINESS AND
                                                  PROFESSIONS CODE SECTION
26                                                17200, ET SEQ. (DERIVATIVE);**
                                              13. **FRAUDULENT TRANSFER -
27                                                ACTUAL FRAUD (CAL. CIV.
                                                  CODE § 3439.04(A)(1)) -
28                                                (DERIVATIVE);**

14. **FRAUDULENT TRANSFER/VOIDABLE TRANSACTION - CONSTRUCTIVE FRAUDULENT TRANSFER (DERIVATIVE) (CAL. CIV. CODE §§ 3439.04(A)(2), ET AL.);**
15. **CONCEALMENT;**
16. **RESCISSION OF WRITTEN CONTRACT REGARDING TRANSFER OF ASSETS (DERIVATIVE CLAIM);**
17. **MONEY HAD AND RECEIVED (DERIVATIVE); AND**
18. **UNJUST ENRICHMENT (QUASI-CONTRACT) (RESTITUTION).**

## I.    PRELIMINARY STATEMENT

1.     Plaintiff Candid Ventures, LLC ("Candid Ventures") moves this Court for an emergency Temporary Restraining Order ("TRO") against Suresh Deopura ("Deopura"), Dew Ventures, Inc. ("Dew Ventures" or "Dew") and FeathersUp India Pvt. Ltd. ("FeathersUp") (collectively "Defendants"), to address the imminent and irreparable harm that Candid Ventures will suffer should relief not be granted. More specifically, Candid Ventures asks this Court to issue a temporary restraining order freezing all assets that non-party Nestlings, Inc., through its agents Rajashekar Basavaraju ("Basavaraju") and Sowmya Satish ("Satish"), fraudulently transferred to Dew Ventures, including all assets of FeathersUp, without proper board or company approval, and to the detriment of its preferred shareholder and secured creditor, Candid Ventures.

2.     Candid Ventures additionally seeks an award of damages caused by Defendants' tortious interference with contract, breaches of fiduciary duty, conspiracy, fraudulent transfer, and aiding and abetting.

## II.    THE PARTIES

3.     Plaintiff Candid Ventures, LLC (f/k/a AnuPriya, LLC) is an Ohio limited liability company with its principal place of business at 10290 Alliance Road, Blue Ash, OH 45242. All of Candid Ventures' members are citizens of the state of Ohio or are Ohio entities whose members are citizens of the State of Ohio.

///

1    4.    Defendant Suresh Deopura, an individual, is a California citizen residing at 43745
2    Nansa Court, Fremont, CA 94539.

3    5.    Defendant Dew Ventures, Inc., is a California corporation with its principal place of
4    business at 983 Corporate Way, Fremont, CA 94539.

5    6.    Defendant FeathersUp India Pvt. Ltd. is an Indian business entity with its registered
6    headquarters at No. G-2, Prestige Meridian-1, 29, M G Road, Bengaluru, Bangalore North,
7    Karnataka, India – 560001.

8    III.    **JURISDICTION AND VENUE**

9    7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the
10    amount in controversy exceeds $75,000 and there is complete diversity between the Plaintiff and
11    the Defendants.

12    8.    The Court has personal jurisdiction over Defendant Deopura because he is a citizen
13    of the State of California and because he engaged in fraudulent and tortious activity within the State
14    of California in his capacity as director and/or officer of Nestlings and Dew Ventures, corporations
15    with their principal place of business in the United States District Court, Northern California
16    District.

17    9.    The Court has personal jurisdiction over Dew Ventures because it is a California
18    corporation with its principal place of business in the United States District Court, Northern
19    California District, that tortiously interfered with the Investors' Rights Agreement, the Series Seed
20    Preferred Stock Purchase Agreement, and Candid's Notes in the Northern District of California, and
21    knew that its actions would cause harm in the State of California, and intended to cause harm to
22    Candid Ventures.

23    10.    Venue is proper in this Court based on the express and unequivocal consent in the
24    Investors' Rights Agreement and the Series Seed Preferred Stock Purchase Agreement. Moreover,
25    venue is also proper pursuant to 28 U.S.C § 1391(b) and (c) because a substantial part of the events
26    giving rise to the claim occurred in this district, and because the Court has personal jurisdiction over
27    Defendants.

28    ///

1

#### IV.   FACTUAL BACKGROUND

2

**Nestlings' Obligations to Its Preferred Shareholder, Candid Ventures**

3

11.   Candid Ventures is a minority shareholder of Nestlings; however, it holds all

4

outstanding, issued Series Seed Preferred Stock that give Candid Ventures certain priority rights

5

over Nestlings and its common shareholders.

6

12.   Candid Ventures owns 4,714,016 shares of Nestlings Series Seed preferred stock,

7

representing 100% of all Nestlings' Preferred Shares, and 30% of Nestlings' total outstanding, issued

8

shares.

9

13.   Pursuant to Section 2.3.1 of Nestlings' October 20, 2020, Amended and Restated

10

Articles of Incorporation (the "Articles"), the "Requisite Holders" of Nestlings are defined as "a

11

majority of outstanding Preferred Shares." (See **Exhibit A** – Articles).

12

14.   At all times relevant to this Action, Candid Ventures has been the sole holder of all

13

of Nestlings' outstanding Preferred Shares, making it the sole "Requisite Holder."

14

15.   Pursuant to Section 3.2 of the Articles, Candid Ventures was further entitled to elect

15

a "Preferred Director." Candid Ventures appointed Anushree Vora as its Preferred Director.

16

16.   Pursuant to Section 3.3 of the Articles, Nestlings was prohibited from taking any of

17

the following action "without the written consent or affirmative vote of the Requisite Holders. . . :

18

3.3.1. liquidate, dissolve or wind-up the business and affairs of the Corporation, affect any

19

merger, consolidation or share exchange or any other Deemed Liquidation Event, or consent to

20

any of the foregoing;

21

* * *

22

3.3.4. without limitation, alter, amend or modify any of the rights, privileges or preferences

23

of the Preferred Shares;

24

* * *

25

3.3.7 sell any of the assets of the Corporation below their fair market value, except in the

26

ordinary course of business consistent with past practice or as approved by the Board of Directors,

27

including the approval of the Preferred Director;

28

///

17.    Further, "any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force or effect." (Id. at Sec. 3.3.)

18.    In connection with the issuance of the Series Seed Preferred Stock, Candid Ventures and Nestlings further entered into the October 29, 2020, Series Seed Preferred Stock Purchase Agreement ("Preferred Stock Agreement") and Investors' Rights Agreement (the "IRA"). See **Exhibit B** (Preferred Stock Agreement) and **Exhibit C** (IRA).

19.    Pursuant to Section 5.5 of the IRA, Nestlings covenanted and warranted "that it shall not, without approval of the Board of Directors, which approval must include the Requisite Preferred Director Vote:

*   *   *

(d) incur any aggregate indebtedness in excess of $100,000 that is not already included in the Budget (as defined in Section 3.1(c)), other than trade credit incurred in the ordinary course of business; [or]

(g) sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business[.]"

20.    In sum, in exchange for Candid Ventures' investment as a Preferred Shareholder, Nestlings represented and warranted that it would not incur any aggregate indebtedness above $100,000 (the "Maximum Aggregate Indebtedness"), would not liquidate, winddown, or dissolve the company, would not sell the assets of the company below fair market value, and would not limit or alter Candid Ventures' Preferred Shareholder rights without Candid Ventures express, written approval.

**Nestlings' Insolvency Due to Officer Mismanagement**

21.    Thereafter, Nestlings, through its officers Basavaraju and Satish, represented to Candid Ventures that it could not maintain operations without additional funding.

22.    Through two promissory bridge notes executed on December 29, 2023, and July 11, 2024, Candid Ventures loaned to Nestlings a total of $51,000 to continue funding operations while Nestlings and its officers pursued additional financing ("Candid's Notes"). Candid's Notes were perfected and filed with the California Secretary of State on August 13, 2024.

23.     In June of 2024, Satish and Basavaraju represented to Anushree Vora that Nestlings was out of operating capital and suggested possible dissolution of Nestlings.

24.     In July of 2024, Anushree Vora arranged for Satish and Basavaraju to come to Cincinnati, Ohio to meet with potential investors affiliated with Candid Ventures ("Investor Group"), in an effort to save the company and prevent dissolution. The Investor Group shared a non-binding term sheet with specific due diligence requests. Satish and Basavaraju requested less than a month of time to gather the due diligence items. In order to fund their efforts, Satish and Basavaraju, on behalf of Nestlings, then secured $14,000 in debt from Candid Ventures to continue operations through July 2024 to complete diligence in an effort to secure funding from the Investor Group or another entity.

25.     Thereafter, the Investor Group repeatedly requested that Nestlings provide its due diligence materials and standard financials, including current balance sheets, income statements, and capitalization tables.

26.     Weeks after making this request, Satish and Basavaraju disclosed that they had not adequately maintained their books and records, and did not have much of the documentation requested by the Investor Group.

27.     After several failed attempts were made by the Investor Group to obtain Nestlings' financials, the Investor Group ultimately withdrew its investment proposal.

28.     On August 3, 2024, in a Board meeting for Nestlings, with company counsel present, Nestlings' CEO and COO revealed that a large amount of loans needed to be approved after the fact by the Board and Candid Ventures, as the preferred shareholder. Satish and Basavaraju revealed that the company had taken on $334,000 of debt from Dew Ventures (the "Unauthorized Debt").

29.     Basavaraju and Satish sought to "ratify" the Unauthorized Debt through board action. The Preferred Director voted against ratification of the Unauthorized Debt, stating that she is unable to ratify acts taken by Basavaraju and Satish without authority of the Board or its Preferred Shareholder, further informing that incurring the Unauthorized Debt would violate Candid Ventures' rights under the IRA.

///

30.     On August 4, 2024, given Nestlings' failure to provide the Investor Group with these standard financials that should be regularly maintained in the ordinary course of business, Candid Ventures and its Preferred Director demanded that, pursuant to California Corporations Code §§ 1500, 1600, and 1601 et seq., Sections 5.8, 7.5, and 7.6 of the Amended and Restated Bylaws, and Section 3.1 of the IRA, that Nestlings immediately produce certain books and accounting, including but not limited to balance sheets, income statements, cashflows statements, budgets and business plans, annual reports, capitalization tables, and statements of accounts receivable.

31.     To this date, Nestlings has still not complied with Candid Ventures' demand.

32.     In response to Candid Ventures' demand, Nestlings did produce an unapproved copy of their latest capitalization table, which also reflected the incurrence of $334,000 unauthorized debt. The capitalization table reflected that the "effective date of board consent" for the Unauthorized Debt was "missing."

33.     Candid Ventures reminded Nestlings that it was previously unaware of Nestlings' incurrence of the Unauthorized Debt, which was incurred without the approval of the Requisite Preferred Director pursuant to Section 5.5 of Candid Ventures' IRA. Candid Ventures further demanded that Nestlings produce any board consents that purportedly authorized the debt.

34.     On August 13, 2024, Basavaraju produced four promissory notes dated between December 2022 and July 2024, in which Nestlings, through its Chief Operations Officer, Basavaraju, purportedly accepted $334,000 from Dew Ventures with all assets of Nestlings offered as collateral on the notes (the "Unauthorized Notes").  Nestlings' Chief Executive Officer, Satish, informed that she further had knowledge of and approved the Unauthorized Debt and the Unauthorized Notes.

35.     The metadata for each of the Unauthorized Notes reflects that the Notes were not created until July 19-31, 2024, despite the incorrect dates falsely stated on the Notes. The Unauthorized Notes were created retroactively, and sent to the Preferred Director after she expressly rejected ratification of the Unauthorized Debt. Several of the Unauthorized Notes further reflected a 12% interest rate, despite previous representations by Satish that the notes included an 8% rate.

///

///

36. Basavaraju's and Satish's ultra vires acts of accepting the Unauthorized Debt and retroactively executing the Unauthorized Notes were done without authority of the Nestlings' Board or its Preferred Shareholder.

**Defendants Colluded to Squeeze Candid Ventures Out of Nestlings and Transfer All Assets to Dew Ventures**

37. After Candid Ventures discovered Nestlings' mismanaged state of affairs, Satish, Basavaraju, Deopura and Dew Ventures conspired to force Candid Ventures out of the company and transfer all assets of Nestlings to Dew Ventures.

38. The Defendants collectively conspired to force Candid Ventures out of the company by crafting debt and/or equity deals that required Candid Ventures to forfeit all of its rights as a Preferred Shareholder and creditor of Nestlings. When Candid Ventures rejected these proposals, per its rights as a Preferred Shareholder, Defendants sought to force Candid Ventures to accept the proposals by threatening legal action and falsely accusing Candid Ventures' of breaching its fiduciary obligations by rejecting Dew Ventures' proposals. After Candid Ventures responded that it was merely asserting its contractual rights as a Preferred Director and secured creditor, Defendants thereafter sought alternate means to force Candid Ventures out of the company by retroactively executing the Unauthorized Notes, immediately demanding repayment of the same, executing the Unauthorized Asset Transfer Agreement, as that term is defined below, and completing transfer of Nestlings' assets to Dew Ventures.

39. On August 3, 2024, Dew Ventures proposed to loan $300,000 to Nestlings at a 15% interest rate or 1.5x payback amount, secured by all Nestlings assets on a "debt free basis," and requiring that all members, including Candid Ventures "sign a waiver of, and must be a party to, the loan agreement." As a condition of closing, the proposed loan required that Nestlings procure and produce a "waiver of rights" from all Nestlings' debt holders and shareholders, including Candid Ventures.

40. On August 9, 2024, Dew Ventures proposed a new offer to purchase 50% equity of Nestlings in exchange for $500,000, on the condition that Candid Ventures forfeit and waive all of its rights as a Preferred Shareholder, and grant to Dew Ventures unilateral decision-making authority

under a new class of priority Class A shares as to all future debt and equity deals, and the right to assume 100% of Nestlings on a "debt-free basis" without any consideration to Candid Ventures' for its equity holdings in Nestlings. The proposal required that "[t]he rights associated with the Series Seed Preferred shares, including any preferred shareholder rights, will be revoked" and that Candid's shares must be "converted to Common shares."

41.    Candid Ventures exercised its Preferred Shareholder rights under the IRA to reject both of Dew Ventures' proposals.

42.    Thereafter, on August 13, 2024, the Nestlings' Board, which included Deopura, Satish, and Basavaraju, voted to dissolve the company.  The Preferred Director voted in favor of the dissolution, with the qualification and express condition that the company must first obtain approval of Candid Ventures, as Nestlings' sole Requisite Holder, pursuant to Section 3.3 of the Articles. The Preferred Director notified Nestlings that in order to consider their dissolution proposal, Candid Ventures required a formal winddown proposal that itemized all company assets and accounts receivable, together with a proposed order of distribution of assets.

43.    To this date, Nestlings has failed to provide Candid Ventures with the requested documents, and, accordingly, no dissolution or winddown activity has been authorized by Candid Ventures.

44.    On September 13, 2024, one day after Suresh Deopura resigned from the Nestlings Board, Dew Ventures sent a letter to Nestlings and its Preferred Director demanding repayment of the Unauthorized Debt, or, in the alternative, that Nestlings transfer to Dew Ventures all company assets including but not limited to company bank accounts, intellectual property, email accounts, software, contracts, social media assets, and all assets held by AdmitAlly Technology Inc. and FeathersUp India Pvt. Ltd (entities owned by Nestlings at the time).

45.    That same day, Candid Ventures notified Nestlings that it is formally demanding repayment of Candid's Notes, which have priority and are first in line for repayment ahead of any other Nestlings' creditor, including Dew Ventures, as Candid's Notes were perfected first in time through public filings with the California Secretary of State.  Candid Ventures further restated its position that Dew Ventures is demanding repayment of $334,000 in promissory notes that Mr.

Basavaraju and Ms. Satish entered into improperly and without the consent of the Nestlings' Board and Candid Ventures, as its preferred shareholder.

46.    On September 18, 2024, Basavaraju and Satish called an immediate board meeting to discuss Candid Ventures' and Dew Ventures' demands for payment.  Basavaraju suggested that the Board vote on whether to transfer all assets to Candid Ventures or Dew Ventures.  The Preferred Director informed Basavaraju and Satish that the transfer of assets constitutes winddown activity that Candid Ventures has not approved, that Dew Ventures' Unauthorized Notes were not approved by Candid Ventures and accordingly are void, and that even if Dew Ventures' Unauthorized Notes were considered enforceable, they are subordinate to Candid's priority Notes.  Accordingly, the Preferred Director objected to having any vote as to the transfer of assets to Dew Ventures.

47.    On September 18, 2024, Nestlings notified Candid Ventures that, over the Preferred Director's objection, it had decided to reject Candid Ventures' September 13 Demand for Payment on the basis that Nestlings had "resolved to transfer all assets [of Nestlings] to Dew Ventures." Contemporaneously, Nestlings notified Dew Ventures that it "ha[d] resolved to prioritize [Dew Ventures'] claim [over Candid Ventures] and [will] transfer all assets of Nestlings Inc to [Dew Ventures to] satisfy the debt."

48.    On September 19, 2024, Candid Ventures again wrote to Nestlings and Dew Ventures to notify both parties that Candid's Notes have priority over Dew Ventures' Unauthorized Notes; that the Unauthorized Notes were not properly issued; that Candid Ventures, as the sole Preferred Shareholder, has not authorized the dissolution or transfer of any company assets; and that should Nestlings and Dew Ventures proceed with the proposed asset transfer, Candid Ventures would be required to initiate legal action to seek preliminary/injunctive relief, declaratory judgment as to its priority status, and damages.

49.    Thereafter, on September 19, 2024, despite Dew Ventures' knowledge of Candid Ventures' priority creditor status and rights as a Preferred Shareholder, Dew Ventures, through Deopura, sent a "proposed asset transfer agreement" to Nestlings in which it requested Nestlings to "convey all of Nestlings' company assets to Dew Ventures."

///

50.    Without the consent and authorization of Candid Ventures, and with the specific intent of defrauding and causing harm to Candid Ventures, Satish and Dew Ventures (through Deopura) signed the proposed asset transfer agreement on September 19, 2024 (the "Unauthorized Asset Transfer Agreement").

51.    As Dew Ventures knew that its conduct in executing and taking steps towards completing the Unauthorized Asset Transfer Agreement would cause immediate and irreparable harm to Candid Ventures, Dew Ventures sought to shield itself from liability by specifically including in the Unauthorized Asset Transfer Agreement that Nestlings must "indemnify and hold harmless [Dew Ventures], from and against any and all losses . . . including any lawsuit against Company by Anu Vora or Candid Ventures." The conduct by the defendants as described in paragraphs 15 through 57 herein supra shall collectively be referred to as the "Transfer and Dissolution Scheme."

52.    On September 24, 2023, Candid Ventures filed suit in the United States District Court for the Southern District of Ohio, Case No. 1:24-cv-00528-MWM, against Dew Ventures, Satish, Basavaraju, and Nestlings, asking the Court to issue a TRO preventing Nestlings from taking further action to effectuate the Unauthorized Asset Transfer Agreement.

53.    The Court granted the TRO; however, by the time the TRO was issued, Nestlings had already transferred all of its assets to Dew Ventures.

54.    Dew Ventures was ultimately dismissed from the Ohio action for lack of personal jurisdiction; which rendered the Southern District of Ohio unable to issue preliminary injunctive relief freezing the assets fraudulently transferred to Dew Ventures, despite the Court's finding that Plaintiff had otherwise satisfied all elements of its claim for preliminary injunctive relief.

55.    Without immediate intervention by the Court freezing all assets of Nestlings fraudulently transferred to Dew Ventures; Candid Ventures will suffer immediate and irreparable harm including but not limited to the transfer, assignment, destruction, or use of the disputed assets over which Candid Ventures has a vested interest as both a Preferred Shareholder and priority secured creditor.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### V.    PROCEDURAL HISTORY

56.    Plaintiff initially filed a Complaint against Dew Ventures as well as others in the United States District Court for the Southern District of Ohio Western Division Cincinnati where the Court granted Plaintiff's application for a temporary restraining order on September 30, 2024 finding that "Plaintiff has established, for the purposes of a temporary restraining order, a strong likelihood of success on the merits of its breach of contract clause (Case 1:24-CV-528, *Candid Ventures, LLC v. Nestlings, Inc. et al.* order granting temporary restraining order – Judge Matthew W. McFarland p.7). Despite the finding, a preliminary injunction was denied on the sole basis that the Court lacked personal jurisdiction in the State of Ohio over Dew Ventures. This action seeks to rectify this judicial issue by filing this litigation in the Northern District of California so that the disputed assets now held by Dew Ventures may be frozen.

### COUNT I

### TEMPORARY RESTRAINING ORDER

### (Against All Defendants)

57.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

58.    Pursuant to California Code of Civil Procedure Section 525-534, Plaintiff has appended to the end of this Complaint the Verification of Anushree Vora verifying the facts as set forth in this Complaint and the Certification of Counsel for Plaintiff detailing his efforts to notify Defendants of this Action and the bases for an *ex parte* order.

59.    Candid Ventures perfected Candid's Notes on August 13, 2024, through their filing with the California Secretary of State.

60.    Dew Ventures is not a secured creditor of Nestlings as the Unauthorized Notes that were retroactively entered into in July of 2024 were not authorized by Nestlings' Board or its Preferred Shareholder.

61.    Even if Dew Ventures was a holder of properly issued promissory notes, Dew Ventures did not seek to file and perfect the Unauthorized Notes until August 22, 2024, after Candid Ventures perfected its Notes.

62.    Candid Ventures is likely to succeed on the merits in its claim as a secured creditor of Nestlings with priority over Dew Ventures, and that Defendants tortiously interfered with Candid Ventures' contracts, and that Defendants fraudulently conspired to deprive Candid Ventures of its debt and equity interests in Nestlings through the Fraudulent Transfer. *See* Cal. Com. Code § 9310 (providing that filing a security interest is required for perfection); *id*. at § 9322(a)(1) ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection.").

63.    Despite Candid Ventures notifying all Defendants of its priority status, Defendants have taken action to transfer all of Nestlings' company assets to Dew Ventures, including through the Unauthorized Asset Transfer Agreement and subsequent transfer of all the assets.

64.    If the Court does not freeze all of Nestlings' assets transferred to Dew Ventures, Candid Ventures is likely to suffer immediate and irreparable harm, including Dew Ventures' distribution, sale, destruction, or use of Nestlings' company assets.

65.    The harm Candid Ventures is likely to suffer will be irreparable as the proposed Unauthorized Asset Transfer Agreement would eviscerate Candid Ventures' rights as a Preferred Shareholder, subordinate its status as a priority creditor, cause it to incur lost revenues on any improperly transferred assets, and could result in the irreparable harm or destruction of certain assets held by Nestlings including intellectual property, software, and contracts.

66.    Issuance of a temporary restraining order will create no unjustifiable harm to any third party.

67.    Issuance of a temporary restraining order will serve the public interest as it will prevent the unauthorized conduct as stated herein and will allow to the Court to ensure the proper distribution of Nestlings' assets among its creditors.

68.    Wherefore, Candid Ventures seeks an order from this Court temporarily freezing all accounts and assets of Nestlings transferred to Dew Ventures.

///

///

///

///

**COUNT II**

**PRELIMINARY AND PERMANENT INJUNCTION**

**(Against All Defendants)**

69.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

70.     For the same reasons as stated in Count I, Candid Ventures will suffer imminent, irreparable injury should this court not issue preliminary and permanent injunctive relief preserving Candid Ventures' Preferred Shareholder rights and status as a priority creditor.

71.     Defendants' actions show a manifest intent to deprive Candid Ventures of its rights as a preferred shareholder and secured creditor of Nestlings.

72.     To preserve the status quo among the parties during the pendency of this Action, and for the reasons as stated above in Count I, this Court should issue a preliminary and permanent injunction freezing all accounts and assets of Nestlings transferred to Dew Ventures.

**COUNT III**

**DECLARATORY JUDGMENT**

**(Against All Defendants)**

73.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

74.     Candid Ventures perfected Candid's Notes on August 13, 2024, through their filing with the California Secretary of State.

75.     Dew Ventures is not a secured creditor of Nestlings as the Unauthorized Notes that were retroactively entered into in July of 2024 were not authorized by Nestlings' Board or its Preferred Shareholder.

76.     Even if Dew Ventures was a holder of properly issued promissory notes, Dew Ventures did not seek to file and perfect the Unauthorized Notes until August 22, 2024, after Candid Ventures perfected its Notes.

77.     Wherefore, Candid Ventures seeks declaratory judgment that Candid's Notes have priority over Dew Ventures' Unauthorized Notes.

78.    Candid Ventures further seeks declaratory judgment pursuant to Cal. Code § 3439.07 voiding the Unauthorized Notes and the Unauthorized Asset Transfer Agreement.

## COUNT IV

### TORTIOUS INTERFERENCE WITH CONTRACT

#### (Against Dew Ventures)

79.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

80.    Candid Ventures has valid, enforceable contracts with Nestlings, including but not limited to the IRA and Candid's Notes.

81.    Dew Ventures had knowledge of Candid Ventures' IRA and Candid's Notes, including through Candid Ventures' express notice to Dew Ventures, and through its agent Suresh Deopura's participation on Nestlings' Board.

82.    Dew Ventures induced Nestlings to breach its agreements with Candid Ventures, including but not limited to through its propounding of the Unauthorized Asset Transfer Agreement to Nestlings.

83.    As a result of Dew Ventures' tortious interference with Candid Ventures' contracts, Candid Ventures has suffered damages in an amount to be determined at trial.

## COUNT V

### VIOLATION OF CALIFORNIA UNIFORM VOIDABLE TRANSACTIONS ACT

#### (Against All Defendants)

84.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

85.    Defendants conspired to defraud Candid Ventures of its rights as a Preferred Director and Secured Creditor of Nestlings, including but not limited to Candid Ventures' ability to collect the assets of Nestlings as secured collateral under Candid's Notes.

86.    In furtherance of their fraudulent scheme, and with the specific intent to prevent Candid Ventures from acquiring Nestlings' assets, Defendants caused Nestlings to transfer all of its assets to Dew Ventures (the "Fraudulent Transfer").

87.     Defendants acted with the actual intent to hinder, delay, and defraud Candid Ventures as a creditor of Nestlings.

88.     As a result of Defendants' Fraudulent Transfer, Candid Ventures seeks an order from this Court declaring the Fraudulent Transfer void and unwinding the Fraudulent Transfer, in addition to an award of monetary damages, punitive damages, attorneys' fees, and other equitable relief to be determined at trial.

**COUNT VI**

**<u>BREACH OF FIDUCIARY DUTIES</u>**

**(Against Defendant Deopura)**

89.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

90.     As a director of Nestlings, Deopura owed fiduciary duties to Nestlings and its shareholders, including but not limited to the duties of loyalty, prudence, candor, and care.

91.     Deopura purported to saddle Nestlings with at least $334,000 in Unauthorized Debt without the requisite authority or prior approval of the Nestlings' Board or its shareholders.

92.     Deopura further retroactively executed the Unauthorized Notes with all of Nestlings' assets as collateral, again without authority of the Nestlings' Board or its Preferred Shareholder. Furthermore, these notes were created after the Preferred Shareholder explicitly confirmed that these debts were never approved prior to funding, and therefore were invalid.

93.     Deopura acted out of self-interest, as the Unauthorized Notes were executed in favor of Dew Ventures, over which Deopura is, upon information and belief, the sole owner.

94.     Deopura breached his fiduciary duties to Candid Ventures by carrying out the conspiracy to strip Candid Ventures of its rights as a Preferred Shareholder and Secured Creditor of Nestlings.

95.     Wherefore, Candid Ventures has suffered damages, including but not limited to lost profits and harm to the value of its equity holdings in Nestlings, in an amount to be determined at trial, in addition to such other punitive damages, attorneys' fees, and equitable relief as the Court may deem just and proper.

**COUNT VII**

**<u>CONSPIRACY</u>**

**(Against All Defendants)**

96.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

97.     Defendants conspired to deprive Candid Ventures of its rights as a Preferred Shareholder and secured creditor of Nestlings.

98.     Defendants took material steps towards this unlawful purpose, including but not limited to saddling the company with debt far in excess of the Maximum Aggregate Indebtedness, conspiring to breach Nestlings' agreements with Candid Ventures, entering into the Unauthorized Asset Transfer Agreement, and engaging in the Fraudulent Transfer.

99.     As a result of Defendants' conspiracy, Candid Ventures has suffered damages in an amount to be determined at trial.

**COUNT VIII**

**<u>AIDING AND ABETTING</u>**

**(Against all Defendants)**

100.     Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 99 of this Complaint.

101.     Upon information and belief, each defendant had actual knowledge of the wrongful conduct of the other Defendants as set forth herein, including the commission of the unfair business practices, conversion, fraudulent transfers and breaches of fiduciary duties (Dissolution Scheme).

102.     Upon information and belief, each defendant gave substantial assistance to the other Defendants in committing such wrongful conduct through his or its encouragement of, and assistance in planning and implementing, the Dissolution Scheme, a purpose of which was to avoid any monetary payment to Plaintiff in relation to its shares of Nestlings while ensuring that the value of its interests were actually distributed either directly through distributions to the Defendants or indirectly to them through Dew Ventures and FeathersUp to avoid Nestlings' fulfillment of its

///

obligations and to defraud Plaintiff as a Nestlings shareholder for the benefit of the Defendants pursuant to and in furtherance of the conspiracy.

103.    Upon information and belief, in aiding and abetting the wrongful acts alleged herein, these Defendants' acts went beyond the performance of a professional duty to serve a client and involve a conspiracy to violate a legal duty in furtherance of their own financial gain.

104.    As a direct and proximate result of such aiding and abetting of such wrongful conduct, Plaintiff has suffered general, compensatory and consequential damages, including the diminution in value of the companies, in an amount to be proven at trial, but at least $5,000,000.00 plus treble damages and civil penalties.

105.    Upon information and belief, the conduct of these Defendants in aiding and assisting such wrongful conduct was willful, malicious, oppressive, and in conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages under Cal. Civil Code § 3294.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

## COUNT IX

## RECEIVING AND/OR CONCEALING STOLEN PROPERTY
## (CAL. PEN. CODE SECTION 496(C))

### (Against All Defendants)

106.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 105 of this Complaint.

107.    Penal Code section 496(a) provides the following:

"[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year[.]"

Penal Code section 496(c) provides that "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of

actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

108.    Plaintiff is and was a shareholder of Nestlings as set forth herein. Pursuant to Plaintiff's interests in this business Plaintiff is entitled to property, assets, dividends and distribution payments.

109.    During the time period of October 29, 2020, through the present (and continuing), Plaintiff was and is owed property, assets, dividends and distribution payments from Nestlings.

110.    During the time period of September 19, 2024, through the present (and continuing), these Defendants, and each of them, received, concealed, and/or withheld property, assets (which could have been liquidated by the defendants to provide dividends and distributions to Plaintiff), dividends and distribution payments owed to the Plaintiff from Nestlings. These Defendants, and each of them, continue to receive, conceal, and/or withhold property, assets, dividends, and distribution payments owed to the Plaintiff from Nestlings. These Defendants, and each of them, have aided in receiving, concealing, and/or withholding the same and continue to do so.

111.    These Defendants, and each of them, knew that the property, assets, dividends and distribution payments were stolen and obtained by theft at, and/or before, the time when these Defendants, and each of them, received, concealed, and/or withheld the property, assets, dividends and distribution payments owed to the Plaintiff from Nestlings. These Defendants, and each of them, knew that the property, assets, dividends and distribution payments were stolen and obtained by theft at, and/or before, the time when these Defendants, and each of them, aided in the same.

112.    Between September 19, 2024, and the present (and continuing), Defendants have owned and possessed, and currently own and possess, property and assets including, but not limited to, real property, proceeds from real property, proceeds from escrow accounts, structures, equipment, intellectual property, checks, wires, ACHs, accounts receivable, financial instruments, securities, cash, credit, letters of credit, lines of credit, loans, bank accounts, personal property, similar property, other property, and any and all intangible and tangible property that may be possessed ("PROPERTY").

///

113.    During the time period of September 19, 2024, through the present, these Defendants, and each of them, have bought, received, sold, withheld, and/or concealed stolen PROPERTY that has been obtained by theft, under the California Supreme Court decision of *Siry Investments, L.P. v. Saeed Farkhondehpour*, (2022) 13 Cal. 5th 333. These Defendants, and each of them, continue to buy, receive, sell, withhold, and/or conceal stolen PROPERTY that has been obtained by theft. These Defendants, and each of them, have aided in the same and continue to do so.

114.    When these Defendants, and each of them, bought, received, sold, withheld, and/or concealed stolen PROPERTY obtained by theft—these Defendants, and each of them, knew that the PROPERTY was stolen and obtained by theft. When these Defendants, and each of them, aided in buying, selling, receiving, withholding, and concealing stolen PROPERTY obtained by theft, these Defendants, and each of them, knew that the PROPERTY was stolen and obtained by theft.

115.    During all relevant times these Defendants, and each of them, knew the presence of the property, assets, dividends payments, distribution payments, and PROPERTY was wrongful.

116.    As a direct result of the acts of these Defendants, and each of them, Plaintiff has suffered damages in an amount to be proven at trial.

117.    Additionally, as a result of the acts of these Defendants, and each of them, Plaintiff was forced to retain legal counsel and incurred legal fees and costs.

118.    Pursuant to Penal Code § 496(c), Plaintiff demands treble damages (and/or punitive damages) and reasonable attorney's fees.

WHEREFORE, Plaintiff hereby prays for damages as hereinafter set forth.

## COUNT X

## <u>CONVERSION (DERIVATIVE)</u>

### (Against Deopura, Dew Ventures, FeathersUp and DOES 3-20)

119.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 118 of this Complaint.

120.    At all times herein mentioned, Candid Ventures was, and still is, the equitable owner of specific funds, receipts, accounts receivable, intellectual property, profits, distributions to

1    shareholders and the sums described herein supra which were possessed by Nestlings and all

2    revenues from approximately October 2020 to the present and ongoing.

3        121.    Defendants named in the cause of action intentionally and substantially interfered

4    with Nestlings property rights and interests through a coordinated, intentional, and orchestrated

5    transfer by unlawfully taking possession of Nestlings' assets for no consideration or less than fair

6    market consideration even if impermissibly granted possession of these assets by other co-

7    defendants through an implausible and false narrative of arms-length bona fide business transactions

8    by way of the Fraudulent Transfer and Dissolution Scheme, and distribution of funds to all

9    shareholders except Plaintiff, and de facto control and management of Nestlings' assets, including

10   intercepting all proceeds and diverting those proceeds for themselves and refusing to allow for the

11   legal transfer of same to all shareholders in Nestlings, including to Plaintiff. Further, Defendants

12   have taken possession and control of Nestlings' assets and interfered with Nestlings' duty to fairly

13   distribute sums owed to each of its shareholders, including distributed assets and profits of Nestlings

14   since 2020 and formally blocked Plaintiff from any such distributions to Plaintiff as a shareholder.

15       122.    Plaintiff did not consent to Defendants' conduct and refusal to transfer such assets

16   away from Nestlings and/or distributions in and by Nestlings to the shareholders equally, the taking

17   of Nestlings' Property, assets and rental funds, de facto successorship of Nestlings and conversion

18   of all funds attributed thereto, and improperly distributed by Nestlings, and Nestlings and Plaintiff

19   were harmed by Defendant's aforementioned actions.

20       123.    As a proximate result of Defendants' conversion, Nestlings suffered actual damages

21   in a sum to be determined at trial, but Plaintiff's share of such damages is in an amount exceeding

22   $20,000,000.

23       WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

24                                    **COUNT XI**

25                                  **CONVERSION**

26              **(Against Deopura, Dew Ventures, FeathersUp and DOES 3-60)**

27       124.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1

28   through 123 of this Complaint.

125.    At all times herein mentioned, Plaintiff was, and still is, an actual owner of certain sums held in trust, as well as those funds owed to it in its individual capacity, including those funds derived from the management, improvement, repair, maintenance, and general operation of Nestlings.

126.    At all times herein mentioned, Plaintiff was, and still is, an actual and/or equitable owner of its equitable share in an amount to be proven at trial, but at least $5,000,000.00 in distributions in 2024 for Nestlings assets, which distributions went to the other owners but not to Plaintiff.

127.    At all times herein mentioned, Plaintiff was, and still is, an actual and/or equitable owner of all revenues from approximately June 2020 to the present and ongoing relating to property Plaintiff has or had an ownership interest in, including without limitation the intellectual properties of Nestlings.

128.    Defendants named in this cause of action distributed and pocketed moneys in connection to various sales of entities and assets in which Plaintiff had and/or has an ownership interest, while improperly withholding and concealing such sales and monetary distributions and intentionally and substantially interfering with Plaintiff's immediate right to possession of those moneys.

129.    Defendants named in this cause of action intentionally and substantially interfered with Plaintiff's property by unlawfully taking possession of its assets by way of the Transfer and Dissolution Scheme and de facto overtaking control and management of its Nestlings related assets, including intercepting all proceeds and diverting those proceeds to themselves and refusing to allow for the legal transfer to Plaintiff. Further, Defendants have taken possession and control of Plaintiff's assets and interfered with Plaintiff's collection of sums owed and management of its assets since 2020.

130.    Plaintiff did not and could not have consented to the transfer of its assets, the taking of its property, assets and funds, Defendants' de facto overtaking of its Nestlings related interests and all funds attributed thereto, and Plaintiff was harmed by Defendants' aforementioned actions.

///

131.    As a proximate result of Defendants' conversion of Plaintiff's property and assets, Plaintiff suffered actual damages in a sum to be determined at trial, but at least $5,000,000.00.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

**COUNT XII**

**VIOLATION OF CAL. BUS. & PROF. CODE 17200**
**UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND**
**PROFESSIONS CODE SECTION 17200, ET SEQ. (DERIVATIVE)**

**(Against All Defendants and DOES 3-100)**

132.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 131 of this Complaint.

133.    By reason of Defendants' fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, said Defendants have violated California Business and Professions Code §17200 et seq. by consummating an unlawful, unfair, and fraudulent business practice, designed to unfairly compete with Nestlings, and which deprived Nestlings of profits from the projects stolen by these unfair competitors and to deprive Plaintiff of the assets, including but not limited to the value and assets of its interest in Nestlings.

134.    By reason of the foregoing, Nestlings as well as Plaintiff, have suffered and continue to suffer damages in a sum which is as yet unascertained. Plaintiff will ask leave of Court to amend its Complaint when the true nature and extent of such damages have been ascertained.

135.    Business and Professions Code section 17200 et seq. (the Unfair Competition Law or "UCL") prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.  Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to: unfairly competing with Nestlings through newly and/or affiliated businesses which took over or obtained Nestlings' intellectual property and business in competition with Nestlings, which Nestlings would have been able to successfully and profitably complete, but for the unfair competition by the defendants here who obtained Nestlings' intellectual property and stock at zero or artificially low costs so as to unfairly compete with Nestlings as a result of the disloyalty of the Nestlings directors and officers, as well as the unfair

and fraudulent actions of the other named defendants in this cause of action. The impact of the newly established competitor defendants and revamped competition had a devastating effecting on Nestlings' ability to compete and win new projects and customers which profits should be restored to Nestlings; knowingly and intentionally; and making and/or disseminating false, misleading, and deceptive statements to the public about the nature and purpose of their loans and distribution of assets to Defendants, about Nestlings' financial stability and ability to perform and attain existing and new contracts and the joint and orchestrated effort to deprive Plaintiff of its assets, including the fair value thereof.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

## COUNT XIII

### FRAUDULENT TRANSFER - ACTUAL FRAUD (CAL. CIV. CODE § 3439.04(A)(1)) - (DERIVATIVE)

### (Against All Defendants and DOES 3-100)

136.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 135 of this Complaint.

137.    Plaintiff is and was a shareholder of Nestlings as set forth herein.

138.    Prior to the completion of the Transfer and Dissolution Scheme, Nestlings was the owner of certain assets, including loan proceeds, including investments by Plaintiff, and intellectual property.

139.    Upon information and belief, pursuant to the Transfer and Dissolution Scheme, Nestlings purported to distribute money to these Defendants and to grant a security interest in such assets to the Defendants, and to transfer Nestlings' assets directly, or indirectly, to Dew and DOES and/or for the benefit of Defendants.

140.    Upon information and belief, these Defendants entered into the Transfer and Dissolution Scheme, and the transfers of its assets thereunder, with the actual intent to hinder, delay and defraud its shareholders, including Plaintiff.

///

///

141.    The Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder to Defendants transferred the essential assets of Nestlings' business to purported lienholders and/or others who then transferred them or caused them to be transferred to an insider or insiders and/or for an insider or insider's benefit.

142.    The Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder to Defendants were not disclosed and were concealed, including from Plaintiff.

143.    The Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder to Defendants purported to transfer substantially all of Nestlings' assets beyond the reach of its creditors, and certain of Nestlings' shareholders, including Plaintiff.

144.    The Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder to Defendants have caused Nestlings to cease its functional existence as a separate entity.

145.    As a direct and proximate result of the Transfer and Dissolution Scheme and the transfers of Nestlings' assets thereunder to Defendants, Nestlings has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

## COUNT XIV

### FRAUDULENT TRANSFER/VOIDABLE TRANSACTION - CONSTRUCTIVE FRAUDULENT TRANSFER (DERIVATIVE) (CAL. CIV. CODE §§ 3439.04(A)(2), ET AL.)

### (Against All Defendants and DOES 3-100)

146.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 145 of this Complaint.

147.    Plaintiff is and was a shareholder of Nestlings as set forth herein.

148.    Prior to the completion of the Transfer and Dissolution Scheme, Nestlings was the owner of certain assets.

149.    Upon information and belief, pursuant to the Transfer and Dissolution Scheme, Nestlings purported to grant a security interest in such assets to Dew and/or FeathersUp, and to transfer Nestlings' assets directly or indirectly to Defendants and/or for the benefit of Defendants.

///

150.     Upon information and belief, at the time of the Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder, Defendants on behalf of Nestlings intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

151.     Upon information and belief, at the time of the Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder, Defendants on behalf of Nestlings was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

152.     Upon information and belief, at the time of the Transfer and Dissolution Scheme, and the transfers of Nestlings' assets thereunder, Defendants on behalf of Nestlings caused itself to be insolvent and/or was rendered insolvent by Defendants.

153.     Upon information and belief, Defendants entered into the Transfer and Dissolution Scheme, and the transfers of its assets thereunder, without receiving reasonably equivalent value in exchange therefor.

154.     As a direct and proximate result of the Transfer and Dissolution Scheme and the transfers of Nestlings' assets thereunder to Defendants, Nestlings has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

## COUNT XV

## <u>CONCEALMENT</u>

**(Against All Defendants and DOES 3-100)**

155.     Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 154 of this Complaint.

156.     As alleged herein, Defendants concealed material facts, including without limitation with respect to the Transfer and Dissolution Scheme and made false representations, as alleged herein, to mislead Plaintiff and prevent Plaintiff from discovering the concealed facts.

///

///

157.    Instances of Defendants concealing/failing to disclose certain information/facts to Plaintiff include, but are not limited to, concealing that all assets had in fact been transferred by Nestlings to Dew Ventures.

158.    Defendants concealed material facts with the intent to defraud and induce Plaintiff to act or refrain from acting as alleged herein.  At the time Plaintiff acted or refrained from acting, Plaintiff was unaware of the concealed facts and would have not acted or refrained from acting if Plaintiff had known the true concealed facts.

159.    As a direct and proximate result of Defendants' concealments, Plaintiff was damaged in an amount according to proof.

160.    Defendants acted with malice, fraud, oppression, and with conscious disregard of Plaintiff's rights and, as a result, Plaintiff should be awarded punitive damages in an amount according to proof.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

### COUNT XVI

### RESCISSION OF WRITTEN CONTRACT REGARDING TRANSFER OF ASSETS (DERIVATIVE CLAIM)

### (Against Deopura and Dew and DOES 1-100)

161.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 160 of this Complaint.

162.    These Defendants' participation in the orchestration the Transfer and Dissolution Scheme had Nestlings enter into contracts with Dew for valuable consideration which these DEFENDANTS received, in which Nestlings did not receive fair and adequate consideration for the Agreements it entered into, such that Nestlings' assets began to be depleted and the entities' value decreased.

163.    The consideration for the obligations of Nestlings have failed, in whole or in part, through the fault of these Defendants, and have also become entirely void under Civil Code section 1689(b)(2) and (3).

///

///

164.    Plaintiff, on behalf of Nestlings seeks to enforce the mutual rescission of the contracts as exemplified in, any and all contracts and agreements to transfer of assets of Nestlings including the transfer of assets to Defendants and any and all agreements made to effectuate the Transfer and Dissolution Scheme as each of these was for an illegal purpose, and as such void, unconscionable, and perpetuated unfair competition between Nestlings and the Defendants named. Alternatively or in addition, Plaintiff seeks to unilaterally rescind these contracts due to these Defendants' fraudulent misrepresentations, including their inducement of Nestlings to enter into the contracts, Defendants' failure of consideration for the obligations, which have also become void and unconscionable.

165.    Nestlings has been harmed, including but not limited to by the transfer of assets for less than fair and adequate compensation.

166.    Plaintiff has served these Defendants with a notice of rescission of the contracts by initiating this action, and hereby demands that these Defendants restore to them the consideration furnished to these Defendants of the assets provided and/or in an amount to be proven at trial, but at least $5,000,000.00 plus any other damages available to Nestlings through rescission, including under Civil Code 1692, and *Village Northridge Homeowners Ass'n. v. State Farm Fire & Cas. Co.* (2010) 50 Cal.4th 913, 921.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

**COUNT XVII**

**<u>MONEY HAD AND RECEIVED (DERIVATIVE)</u>**

**(Against Defendants and DOES 3-100)**

167.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 166 of this Complaint.

168.    These Defendants received funds, consideration and/or money of Nestlings which Plaintiff had invested in Nestlings, that was intended to be paid to and/or used for the benefit of Plaintiff with respect to the assets of Nestlings.

169.    Said funds, consideration and/or money was not paid to and/or used for the benefit of Plaintiff.

170.    These Defendant's conduct was and is a substantial factor in causing Plaintiff's harm. As a proximate result of Defendant's conversion, Plaintiff suffered actual damages in an amount to be proven at trial, but at least $5,000,000.00, the fair market value of its shares in Nestlings

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

## COUNT XVIII

## UNJUST ENRICHMENT  (QUASI-CONTRACT) (RESTITUTION)

### (Against All Defendants and DOES 3-100)

171.    Plaintiff realleges and incorporates, as though set forth fully herein, Paragraphs 1 through 170 of this Complaint.

172.    These Defendants have been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct.

173.    These Defendants received a benefit in the form or intellectual property, personal property and cash distributions from Nestlings that belonged to Nestlings, but obtained by these Defendants through the Transfer and Dissolution Scheme, including transfer of assets to Dew, FeathersUp, and DOES, profits that were the rightful property of Nestlings, as well as monetary distributions made to Defendants, which amounts of unlawful profits these Defendants have retained and continue to retain.

174.    Retention of those monies by these Defendants would be unjust and inequitable. These Defendants abused any discretion Defendants had by failing to disburse to Plaintiff such monies.

175.    These amounts were not legitimately earned by these Defendants and came at the ultimate expense of Plaintiff.

176.    These Defendants' conduct is willful and is a conscious disregard of Nestlings' rights, which create an unjust hardship for Plaintiff

177.    As a result of these Defendants' unjust enrichment, Plaintiff seeks restitution in an amount to be proven at trial, but at least $5,000,000.00 dollars Defendants received from their conduct set forth herein.

WHEREFORE, Plaintiff prays for damages as hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, Candid Ventures respectfully requests that this Court:

1.      Enter a temporary restraining order, attached as Exhibit A to Plaintiff's contemporaneously filed Motion for Temporary Restraining Order and Memorandum in Support;

2.      Preliminarily and permanently freeze all accounts and assets of Nestlings transferred to Dew Ventures;

3.      Declare that the Unauthorized Notes and the Unauthorized Asset Transfer Agreement are void, and that Candid's Notes have priority over Dew Ventures' Unauthorized Notes;

4.      Declare that the transfer of Nestlings' assets to Dew Ventures was fraudulent, and unwind the Fraudulent Transfer;

5.      Enter judgment in favor of Candid Ventures on all counts, and award damages in an amount to be proven at trial, plus attorneys' fees and costs, and pre- and post- judgment interest;

6.      On the Sixth Cause of Action on behalf of Nestlings and its successors and in favor of Nestlings for the amount of damages sustained by Nestlings as a result of the Defendants' breaches of fiduciary duties, and aiding and abetting and conspiracy therein, according to proof plus punitive and/or exemplary damages according to proof, ordering such extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Defendants' wrongs or their other assets so as to assure that PLAINTIFF on behalf of Nestlings and its successors has an effective remedy, awarding to Nestlings restitution from the Defendants, and each of them, ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants and awarding to PLAINTIFF the costs and damages sustained;

7.      Against Defendants on the Ninth Cause of Action in an amount according to proof, plus treble damages and/or punitive damages under Pen. Code § 496(c), plus attorney's fees and costs;

8.      Under Business and Professions Code, sections 17203, 17204 and 17535 and the equitable powers of this Court, Defendants together with their successors and assigns and all persons who act in concert with them or on their behalf, be permanently enjoined from engaging in any of

1  the unlawful, unfair and fraudulent business acts and practices and deceptive advertising described

2  in this Complaint, and be required to take such actions and adopt such measures as are necessary to

3  prevent Defendants from engaging in any further such acts, practices and advertising;

4      9.    Under Business and Professions Code, sections 17203, 17204 and 17535 and the

5  equitable powers of this Court, Defendants, together with their successors and assigns and all

6  persons who act in concert with or on their behalf, be ordered to restore to any person any money

7  or property that Defendants may have acquired by means of the unlawful, unfair and fraudulent

8  business acts and practices described in this Complaint;

9      10.    Against Defendants on the Thirteenth and Fourteenth Causes of Action for an order

10  that the transfers be avoided, that these Defendants hold the transferred assets in trust for Plaintiff,

11  for an accounting, and for judgment in an amount to be proven at trial, but at least $5,000,000,

12  according to proof;

13      11.    Against Defendants on the Eighteenth Cause of Action in an amount according to

14  proof, plus treble damages under Civ. Proc. Code § 732, plus attorney's fees and costs;

15      12.    Disbursements of the action, including reasonable attorneys' fees, accountants' and

16  experts' fees, costs, and expenses, and granting such other and further relief as the Court deems just

17  and proper;

18      13.    For punitive damages, to punish Defendants, and each of them, for their fraudulent,

19  malicious, and oppressive conduct as set forth in the Scheme;

20      14.    For an order of conveyance as appropriate.

21      15.    For imposition of an equitable lien in behalf of Plaintiff;

22      16.    For imposition of a constructive trust in behalf of Plaintiff;

23      17.    For the imposition of a receiver to manage the Property until judgment is entered in

24  favor of Plaintiff;

25      18.    For prejudgment interest at 10% per annum;

26      19.    For costs of suit incurred herein, including reasonable attorney fees as permitted by

27  law; and

28  ///

1    20.    Award such further relief as this Court deems just and proper.

2

3    Date: November 7, 2024              **HORNER LAW GROUP, P.C.**

4

5                                        By: _____

6                                        Clifford R. Horner, Esq.
                                         Brendan J. Dooley, Esq.
7                                        Attorneys for Plaintiff CANDID VENTURES, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3844291

**FILED**
Secretary of State
State of California

~~NOV - 2 2020~~

ICC OCT 29 2020
*Added 11-04-2020
SW*

**AMENDED AND RESTATED
ARTICLES OF INCORPORATION
OF
NESTLINGS INC**

(Pursuant to Sections 902 and 910 of the
California Corporations Code)

The undersigned certify that:

1.     Sowmya Arsikere Satish and Rajashekar Basavaraju are the President and Secretary, respectively, of Nestlings Inc, a California corporation and that this corporation was originally incorporated pursuant to the California Corporations Code on November 18, 2015.

2.     That the Board of Directors duly adopted resolutions proposing to amend and restate the Articles of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its shareholders, and authorizing the appropriate officers of this corporation to solicit the consent of the shareholders therefor; and in accordance with which the Articles of Incorporation of this corporation are amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is Nestlings Inc (the "**Corporation**").

**SECOND:** The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code (the "**General Corporation Law**").

**THIRD:** The total number of shares of all classes of shares which the Corporation shall have authority to issue is (i) 15,714,016 Common Shares, $0.0001 par value per share ("**Common Shares**") and (ii) 4,714,016 Preferred Shares, $0.0001 par value per share ("**Preferred Shares**").

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital shares of the Corporation.

A.     COMMON SHARES

1.     <u>General</u>. The voting, dividend and liquidation rights of the holders of the Common Shares are subject to and qualified by the rights, powers and preferences of the holders of the Preferred Shares set forth herein.

2.     <u>Voting</u>. The holders of the Common Shares are entitled to one (1) vote for each Common Share held at all meetings of shareholders (and written actions in lieu of meetings) The number of authorized Common Shares may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one (1) or more series of Preferred Shares that may be required by the terms of these Amended and Restated

Articles of Incorporation) the Board to such number as will be sufficient from time to time, when added to the previously authorized but unissued Common Shares, to satisfy any conversion rights of the holders of Preferred Shares hereunder, in accordance with Section 405(b) of the General Corporation Law.

B.   PREFERRED SHARES

4,714,016 shares of the authorized and unissued Preferred Shares of the Corporation are hereby designated "**Series Seed Preferred Shares**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. Unless otherwise indicated, references to "Sections" in this Part B of this Article Third refer to sections of Part B of this Article Third. References to "Preferred Shares" mean the Series Seed Preferred Shares.

1.   Dividends.

The holders of then outstanding Preferred Shares shall be entitled to receive, only when, as and if declared by the Corporation's Board of Directors (the "**Board of Directors**"), out of any funds and assets legally available therefor, dividends at the rate of 5% of the Cash Investment Price (as defined below) for each share of Preferred Shares, prior and in preference to any declaration or payment of any other dividend (other than dividends on Common Shares payable in Common Shares). The "**Cash Investment Price**" means an aggregate price of $750,000, allocated ratably among the outstanding Series Seed Preferred Shares. The right to receive dividends on Preferred Shares pursuant to the preceding sentence of this Section 1 shall not be cumulative, and no right to dividends shall accrue to holders of Preferred Shares by reason of the fact that dividends on said shares are not declared. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of shares of the Corporation (other than dividends on Common Shares payable in Common Shares) unless (in addition to the obtaining of any consents required elsewhere in these Amended and Restated Articles of Incorporation) the holders of the Preferred Shares then outstanding shall first receive, or simultaneously receive, in addition to the dividends payable pursuant to the first sentence of this Section 1, a dividend on each outstanding share of Preferred Shares in an amount at least equal to (i) in the case of a dividend on Common Shares or any class or series that is convertible into Common Shares, that dividend per share of Preferred Shares as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Shares and (B) the number of Common Shares issuable upon conversion of a share of Preferred Shares, in each case calculated on the record date for determination of holders entitled to receive such dividend or (ii) in the case of a dividend on any class or series that is not convertible into Common Shares, at a rate per share of Preferred Shares determined by (A) dividing the amount of the dividend payable on each share of such class or series of shares by the original issuance price of such class or series of shares (subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the Original Issue Price (as defined below); provided that, if the Corporation declares, pays or sets aside, on the same date, a dividend on shares of more than one (1) class or series of shares of the Corporation, the dividend payable to the holders of Preferred Shares pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of shares that would result in the highest Preferred Shares dividend. The "**Original Issue Price**" shall mean, with respect to the Series Seed Preferred Shares, $0.3182

2

A0048663

per share, subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to the applicable Preferred Shares.

2.    . Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

2.1    Preferential Payments to Holders of Preferred Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of Preferred Shares then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders or, in the case of a Deemed Liquidation Event (as defined below), out of the consideration payable to shareholders in such Deemed Liquidation Event or the Available Proceeds (as defined below), before any payment shall be made to the holders of Common Shares by reason of their ownership thereof, an aggregate amount of $900,000 allocated ratably among the outstanding Series Seed Preferred Shares, plus any dividends declared but unpaid thereon. If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its shareholders shall be insufficient to pay the holders of Preferred Shares the full amount to which they shall be entitled under this Section 2.3, the holders of Preferred Shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.2    Distribution of Remaining Assets. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment in full of all Liquidation Amounts required to be paid to the holders of Preferred Shares the remaining assets of the Corporation available for distribution to its shareholders or, in the case of a Deemed Liquidation Event, the consideration not payable to the holders of Preferred Shares pursuant to Section 2.3 or the remaining Available Proceeds, as the case may be, shall be distributed among the holders of the Preferred Shares and Common Shares, pro rata based on the number of shares held by each such holder, treating for this purpose all such securities as if they had been converted to Common Shares pursuant to the terms of these Amended and Restated Articles of Incorporation immediately prior to such liquidation, dissolution or winding up of the Corporation. The aggregate amount which a holder of a share of Preferred Shares is entitled to receive under Sections 2.1 and 2.2 is hereinafter referred to as the "**Liquidation Amount**."

2.3    Deemed Liquidation Events.                          .

2.3.1    Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of at least a majority of the outstanding Preferred Shares (the "**Requisite Holders**") elect otherwise by written notice sent to the Corporation at least 10 days prior to the effective date of any such event:

(a)    a merger, consolidation or share exchange in which

(i)    the Corporation is a constituent party or

3

(ii)    a subsidiary of the Corporation is a constituent party and the Corporation issues shares pursuant to such merger, consolidation or share exchange,

except any such merger, consolidation or share exchange involving the Corporation or a subsidiary in which the shares of the Corporation outstanding immediately prior to such merger, consolidation or share exchange continue to represent, or are converted into or exchanged for shares that represent, immediately following such merger, consolidation or share exchange, at least a majority of the shares of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger, consolidation or share exchange, the parent corporation of such surviving or resulting corporation; or

(b)    (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one (1) or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

2.3.2    Effecting a Deemed Liquidation Event.

(a)    The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in Section 2.3.1(a)(i) unless the agreement or plan of merger, consolidation or share exchange for such transaction (the "**Merger Agreement**") provides that the consideration payable to the shareholders of the Corporation in such Deemed Liquidation Event shall be allocated to the holders of shares of the Corporation in accordance with Sections 2.1 and 2.2.

(b)    In the event of a Deemed Liquidation Event referred to in Section 2.3.1(a)(ii) or 2.3.1(b), if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within ninety (90) days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice to each holder of Preferred Shares no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause (ii) to require the redemption of such Preferred Shares, and (ii) if the Requisite Holders so request in a written instrument delivered to the Corporation not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Corporation), together with any other assets of the Corporation available for distribution to its shareholders, all to the extent permitted by California law governing distributions to shareholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to redeem all outstanding Preferred Shares at a price per share equal to the applicable

4

Liquidation Amount. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding Preferred Shares, the Corporation shall redeem a pro rata portion of each holder's Preferred Shares to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares as soon as it may lawfully do so under California law governing distributions to shareholders. The provisions of <u>Section 6</u> shall apply, with such necessary changes in the details thereof as are necessitated by the context, to the redemption of the Preferred Shares pursuant to this <u>Section 2.3.2(b)</u>. Prior to the distribution or redemption provided for in this <u>Section 2.3.2(b)</u>, the Corporation shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event.

        2.3.3  <u>Amount Deemed Paid or Distributed</u>. The amount deemed paid or distributed to the holders of shares of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property, rights or securities to be paid or distributed to such holders pursuant to such Deemed Liquidation Event. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Corporation, including the approval of the Preferred Director (as defined herein).

        2.3.4  <u>Allocation of Escrow and Contingent Consideration</u>. In the event of a Deemed Liquidation Event pursuant to <u>Section 2.3.1(a)(i)</u>, if any portion of the consideration payable to the shareholders of the Corporation is payable only upon satisfaction of contingencies (the "**Additional Consideration**"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of shares of the Corporation in accordance with <u>Sections 2.1</u> and <u>2.2</u> as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the shareholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of shares of the Corporation in accordance with <u>Sections 2.1</u> and <u>2.2</u> after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this <u>Section 2.3.4</u>, consideration placed into escrow or retained as a holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

    3.    <u>Voting</u>.

        3.1  .<u>General</u>. On any matter presented to the shareholders of the Corporation for their action or consideration at any meeting of shareholders of the Corporation (or by written consent of shareholders in lieu of meeting), each holder of outstanding Preferred Shares shall be entitled to cast the number of votes equal to the number of whole Common Shares into which the Preferred Shares held by such holder are convertible as of the record date for determining shareholders entitled to vote on such matter. Except as provided by law or by the other provisions of these Amended and Restated Articles of Incorporation, holders of Preferred Shares shall vote together with the holders of Common Shares as a single class and on an as-converted to Common Shares basis.

3.2    <u>Election of Directors</u>.  The holders of record of the Preferred Shares, exclusively and as a separate class, shall be entitled to elect one director of the Corporation (the **"Preferred Director"**) and the holders of record of the Common Shares, exclusively and as a separate class, shall be entitled to elect two directors of the Corporation; <u>provided</u>, <u>however</u>, for administrative convenience, the initial Preferred Director may also be appointed by the Board of Directors in connection with the approval of the initial issuance of Preferred Shares without a separate action by the holders of Preferred Shares. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of shares entitled to elect such director or directors, given either at a special meeting of such shareholders duly called for that purpose or pursuant to a written consent of shareholders. If the holders of Preferred Shares or Common Shares, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this <u>Section 3.2</u>, then any directorship not so filled shall remain vacant until such time as the holders of the Preferred Shares or Common Shares, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting, and no such directorship may be filled by shareholders of the Corporation other than by the shareholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. The holders of record of the Common Shares and of any other class or series of voting shares (including the Preferred Shares), exclusively and voting together as a single class, shall be entitled to elect the balance of the total number of directors of the Corporation. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this <u>Section 3.2</u>, a vacancy in any directorship filled by the holders of any class or classes or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or classes or series or by any remaining director or directors elected by the holders of such class or classes or series pursuant to this <u>Section 3.2</u>.

3.3    <u>Preferred Shares Protective Provisions</u>.   At any time when at least 1,000,000 shares of Preferred Shares are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation, recapitalization, reclassification, or otherwise, do any of the following without (in addition to any other vote required by law or these Amended and Restated Articles of Incorporation) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

3.3.1    liquidate, dissolve or wind-up the business and affairs of the Corporation, effect any merger, consolidation or share exchange or any other Deemed Liquidation Event, or consent to any of the foregoing;

3.3.2    amend, alter or repeal any provision of these Amended and Restated Articles of Incorporation or Bylaws of the Corporation;

3.3.3    (i) create, or authorize the creation of, or reclassify, any shares unless the same ranks junior to the Preferred Shares with respect to its rights, preferences

6

and privileges, or (ii) increase or decrease the authorized number of any class or series of shares of the Corporation;

3.3.4   without limitation, alter, amend or modify any of the rights, privileges or preferences of the Preferred Shares;

3.3.5   purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of the Corporation other than (i) redemptions of or dividends or distributions on the Preferred Shares as expressly authorized herein, (ii) dividends or other distributions payable on the Common Shares solely in the form of additional Common Shares or (iii) repurchases of shares from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at no greater than the original purchase price thereof;

3.3.6   create, or hold shares in, any subsidiary that is not wholly owned (either directly or through one (1) or more other subsidiaries) by the Corporation, or permit any subsidiary to create, or authorize the creation of, or issue or obligate itself to issue, any shares of any class or series of shares, or sell, transfer or otherwise dispose of any shares of any direct or indirect subsidiary of the Corporation, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary;

3.3.7   sell any of the assets of the Corporation below their fair market value, except in the ordinary course of business consistent with past practice or as approved by the Board of Directors, including the approval of the Preferred Director;

3.3.8   enter into any transaction, agreement or commitment involving the purchase or sale of goods or services in excess of $100,000 in any consecutive 12 month period with any holder of 15% or more of the outstanding shares of the Corporation on a fully-diluted basis; or

3.3.9   increase or decrease the authorized number of directors constituting the Board of Directors, change the number of votes entitled to be cast by any director or directors on any matter, or adopt any provision inconsistent with Article Fifth.

4.   Optional Conversion.  The holders of the Preferred Shares shall have conversion rights as follows (the "**Conversion Rights**"):

4.1   Right to Convert.

4.1.1   Conversion Ratio.  Each share of Preferred Shares shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable Common Shares as is determined by dividing the Original Issue Price by the Conversion Price (as defined below) in effect at the time of conversion.  The "**Conversion Price**" applicable to the Series Seed Preferred Shares shall initially be equal to $0.3182.  Such initial Conversion

7

A0848663

Price, and the rate at which Preferred Shares may be converted into Common Shares, shall be subject to adjustment as provided below.

        4.1.2   <u>Termination of Conversion Rights</u>. In the event of a notice of redemption of any Preferred Shares pursuant to <u>Section 6</u>, the Conversion Rights of the shares designated for redemption shall terminate at the close of business on the last full day preceding the date fixed for redemption, unless the redemption price is not fully paid on such redemption date, in which case the Conversion Rights for such shares shall continue until such price is paid in full. In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Preferred Shares; <u>provided</u> that the foregoing termination of Conversion Rights shall not affect the amount(s) otherwise paid or payable in accordance with <u>Section 2.1</u> to holders of Preferred Shares pursuant to such liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event.

        4.2   <u>Fractional Shares</u>.  No fractional Common Shares shall be issued upon conversion of the Preferred Shares.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation may pay the fair value of the fractional share in cash.

        4.3   <u>Mechanics of Conversion</u>.

        4.3.1   <u>Notice of Conversion</u>.  In order for a holder of Preferred Shares to voluntarily convert Preferred Shares into Common Shares, such holder shall (a) provide written notice to the Corporation's transfer agent at the office of the transfer agent for the Preferred Shares (or at the principal office of the Corporation if the Corporation serves as its own transfer agent) that such holder elects to convert all or any number of such holder's Preferred Shares and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such Preferred Shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Preferred Shares (or at the principal office of the Corporation if the Corporation serves as its own transfer agent).  Such notice shall state such holder's name or the names of the nominees in which such holder wishes the Common Shares to be issued.  If required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing.  The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the Common Shares issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date.  The Corporation shall, as soon as practicable after the Conversion Time (i) issue and deliver to such holder of Preferred Shares, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the Preferred Shares represented by the surrendered certificate that were not

converted into Common Shares, and (ii) pay all declared but unpaid dividends on the Preferred Shares converted.

    4.3.2 <u>Reservation of Shares</u>.  The Corporation shall at all times when the Preferred Shares shall be outstanding, reserve and keep available out of its authorized but unissued shares, for the purpose of effecting the conversion of the Preferred Shares, such number of its duly authorized Common Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares; and if at any time the number of authorized but unissued Common Shares shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Shares, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Amended and Restated Articles of Incorporation.  Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the Common Shares issuable upon conversion of the Preferred Shares, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable Common Shares at such adjusted Conversion Price.

    4.3.3 <u>Effect of Conversion</u>.  All Preferred Shares which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Common Shares in exchange therefor and to receive payment of any dividends declared but unpaid thereon.  Any Preferred Shares so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for shareholder action) as may be necessary to reduce the authorized number of Preferred Shares accordingly.

    4.3.4 <u>No Further Adjustment</u>.  Upon any such conversion, no adjustment to the Conversion Price shall be made for any declared but unpaid dividends on the Preferred Shares surrendered for conversion or on the Common Shares delivered upon conversion.

    4.3.5 <u>Taxes</u>.  The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of Common Shares upon conversion of Preferred Shares pursuant to this <u>Section 4</u>.  The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of Common Shares in a name other than that in which the Preferred Shares so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

   4.4 <u>Adjustments to Conversion Price for Diluting Issues</u>.

    4.4.1 <u>Special Definitions</u>.  For purposes of this Article Third, the following definitions shall apply:

(a)    "**Additional Common Shares**" shall mean all Common Shares issued (or, pursuant to <u>Section 4.4.3</u> below, deemed to be issued) by the Corporation after the Original Issue Date, other than (1) the following Common Shares and (2) Common Shares deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

> (i)    as to any series of Preferred Shares Common Shares, Options or Convertible Securities issued as a dividend or distribution on such series of Preferred Shares;
>
> (ii)   Common Shares, Options or Convertible Securities issued by reason of a dividend, share split, split-up or other distribution on Common Shares that is covered by <u>Section 4.5</u>, <u>4.6</u>, <u>4.7</u> or <u>4.8</u>;
>
> (iii)  Common Shares or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Corporation; or
>
> (iv)   Common Shares or Convertible Securities actually issued upon the exercise of Options or Common Shares actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security.

(b)    "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Shares, but excluding Options.

(c)    "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Shares or Convertible Securities.

4.4.2   <u>No Adjustment of Conversion Price</u>. No adjustment in the Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Common Shares if the Corporation receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Common Shares.

4.4.3   <u>Deemed Issue of Additional Common Shares</u>.

(a)    If the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or

10

Convertible Securities, then the maximum number of Common Shares (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Common Shares issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Conversion Price pursuant to the terms of Section 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of Common Shares issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Conversion Price to an amount which exceeds the lower of (i) the Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Conversion Price that would have resulted from any issuances of Additional Common Shares (other than deemed issuances of Additional Common Shares as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Conversion Price pursuant to the terms of Section 4.4.4 (either because the consideration per share (determined pursuant to Section 4.4.5) of the Additional Common Shares subject thereto was equal to or greater than the Conversion Price then in effect, or because such Option or Convertible Security was issued before the Original Issue Date), are revised after the Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of Common Shares issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Common Shares subject thereto (determined in the manner provided in Section 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Conversion

11

Price pursuant to the terms of Section 4.4.4, the Conversion Price shall be readjusted to such Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)    If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Conversion Price provided for in this Section 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Section 4.4.3). If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Conversion Price that would result under the terms of this Section 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4    Adjustment of Conversion Price Upon Issuance of Additional Common Shares. In the event the Corporation shall at any time after the Original Issue Date issue Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Section 4.4.3), without consideration or for a consideration per share less than the Conversion Price in effect immediately prior to such issuance or deemed issuance, then the Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)    "$CP_2$" shall mean the Conversion Price in effect immediately after such issuance or deemed issuance of Additional Common Shares

(b)    "$CP_1$" shall mean the Conversion Price in effect immediately prior to such issuance or deemed issuance of Additional Common Shares;

(c)    "A" shall mean the number of Common Shares outstanding immediately prior to such issuance or deemed issuance of Additional Common Shares (treating for this purpose as outstanding all Common Shares issuable upon exercise of Options outstanding immediately prior to such issuance or deemed issuance or upon conversion or exchange of Convertible Securities (including the Preferred Shares) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

12

(d)    "B" shall mean the number of Common Shares that would have been issued if such Additional Common Shares had been issued or deemed issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by $CP_1$); and

(e)    "C" shall mean the number of such Additional Common Shares issued in such transaction.

4.4.5    <u>Determination of Consideration</u>.    For purposes of this <u>Section 4.4</u>, the consideration received by the Corporation for the issuance or deemed issuance of any Additional Common Shares shall be computed as follows:

(a)    <u>Cash and Property</u>.    Such consideration shall:

(i)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

(ii)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Corporation; and

(iii)    in the event Additional Common Shares are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in <u>clauses (i)</u> and <u>(ii)</u> above, as determined in good faith by the Board of Directors of the Corporation.

(b)    <u>Options and Convertible Securities</u>.    The consideration per share received by the Corporation for Additional Common Shares deemed to have been issued pursuant to <u>Section 4.4.3</u>, relating to Options and Convertible Securities, shall be determined by dividing:

(i)    The total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options

13

for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii)    the maximum number of Common Shares (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

4.4.6  <u>Multiple Closing Dates</u>. In the event the Corporation shall issue on more than one date Additional Common Shares that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Conversion Price pursuant to the terms of <u>Section 4.4.4</u>, and such issuance dates occur within a period of no more than ninety (90) days from the first such issuance to the final such issuance, then, upon the final such issuance, the Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5    <u>Adjustment for Stock Splits and Combinations</u>. If the Corporation shall at any time or from time to time after the Original Issue Date effect a subdivision of the outstanding Common Shares, the Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Common Shares issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of Common Shares outstanding. If the Corporation shall at any time or from time to time after the Original Issue Date combine the outstanding Common Shares, the Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Common Shares issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of Common Shares outstanding. Any adjustment under this Section shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6    <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive, a dividend or other distribution payable on the Common Shares in additional Common Shares, then and in each such event the Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Price then in effect by a fraction:

(1)    the numerator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)    the denominator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Common Shares issuable in payment of such dividend or distribution.

Notwithstanding the foregoing, (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Conversion Price shall be adjusted pursuant to this Section as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Shares simultaneously receive a dividend or other distribution of Common Shares in a number equal to the number of Common Shares as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

        4.7    Adjustments for Other Dividends and Distributions.    In the event the Corporation at any time or from time to time after the Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of Common Shares in respect of outstanding Common Shares) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Preferred Shares shall receive, simultaneously with the distribution to the holders of Common Shares, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

        4.8    Adjustment for Merger or Reorganization, etc.  Subject to the provisions of Section 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Shares (but not the Preferred Shares) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Sections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Shares shall thereafter be convertible in lieu of the Common Shares into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Common Shares of the Corporation issuable upon conversion of one (1) Preferred Share immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Corporation) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Shares, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Shares.

4.9     Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 4, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Shares a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Shares is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Shares (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Conversion Price then in effect, and (ii) the number of Common Shares and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Shares.

4.10    Notice of Record Date.  In the event:

(a)     the Corporation shall take a record of the holders of its Common Shares (or other shares or securities at the time issuable upon conversion of the Preferred Shares) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other security; or

(b)     of any capital reorganization of the Corporation, any reclassification of the Common Shares of the Corporation, or any Deemed Liquidation Event; or

(c)     of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of the Preferred Shares a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other shares or securities at the time issuable upon the conversion of the Preferred Shares) shall be entitled to exchange their Common Shares (or such other shares or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Shares and the Common Shares. Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

5.      Mandatory Conversion.

5.1     Trigger Events.  Upon either (a) the closing of the sale of Common Shares to the public at a price of at least $1.60 per share (subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to the Common Shares), in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, resulting in at least

16

$20,000,000 of proceeds, net of the underwriting discount and commissions, to the Corporation and in connection with such offering the Common Shares is listed for trading on the Nasdaq Stock Market's National Market, the New York Stock Exchange or another exchange or marketplace approved the Board of Directors, including the approval of the Preferred Director, or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the holders of at least a majority of the outstanding shares of Preferred Shares to be converted at the time of such vote or consent, voting together as a single class on an as-converted basis (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (i) all outstanding shares of such class or series of Preferred Shares to be converted shall automatically be converted into Common Shares, at the then effective conversion rate as calculated pursuant to <u>Section 4.1.1</u> and (ii) such shares may not be reissued by the Corporation.

5.2     <u>Procedural Requirements</u>.   All holders of record of Preferred Shares shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such Preferred Shares pursuant to this <u>Section 5</u>. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of Preferred Shares in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Shares converted pursuant to <u>Section 5.1</u>, including the rights, if any, to receive notices and vote (other than as a holder of Common Shares), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this <u>Section 5.2</u>. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Shares, the Corporation shall (a) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable on such conversion in accordance with the provisions hereof and (b) pay any declared but unpaid dividends on the Preferred Shares converted. Such converted Preferred Shares shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for shareholder action) as may be necessary to reduce the authorized number of Preferred Shares accordingly.

6.     <u>Redemption</u>.

6.1     <u>General</u>.   Unless prohibited by California law governing distributions to shareholders, Preferred Shares shall be redeemed by the Corporation at a price equal to the Original Issue Price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**"), in three (3) annual installments commencing not more than sixty (60) days after receipt by the

17

Corporation at any time on or after October 21, 2026 from the Requisite Holders of written notice requesting redemption of all Preferred Shares (the "**Redemption Request**"). Upon receipt of a Redemption Request, the Corporation shall apply all of its assets to any such redemption, and no other corporate purpose, except to the extent prohibited by California law governing distributions to shareholders. The date of each such installment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**" On each Redemption Date, the Corporation shall redeem, on a pro rata basis in accordance with the number of Preferred Shares owned by each holder, that number of outstanding Preferred Shares determined by dividing (i) the total number of Preferred Shares outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). If on any Redemption Date California law governing distributions to shareholders prevents the Corporation from redeeming all Preferred Shares to be redeemed, the Corporation shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

6.2    Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Preferred Shares not less than forty (40) days prior to each Redemption Date. Each Redemption Notice shall state:

(a)    the number of Preferred Shares held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)    the Redemption Date and the Redemption Price;

(c)    the date upon which the holder's right to convert such shares terminates (as determined in accordance with Section 4.1); and

(d)    for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the Preferred Shares to be redeemed.

6.3    Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of Preferred Shares to be redeemed on such Redemption Date, unless such holder has exercised his, her or its right to convert such shares as provided in Section 4, shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. In the event less than all of the Preferred Shares represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed Preferred Shares shall promptly be issued to such holder.

18

6.4    _Interest._ If any Preferred Shares are not redeemed for any reason on any Redemption Date, all such unredeemed shares shall remain outstanding and entitled to all the rights and preferences provided herein, and the Corporation shall pay interest on the Redemption Price applicable to such unredeemed shares at an aggregate per annum rate equal to twelve percent (12% (increased by one percent (1%) each month following the Redemption Date until the Redemption Price, and any interest thereon, is paid in full), with such interest to accrue daily in arrears and be compounded annually; provided, however, that in no event shall such interest exceed the maximum permitted rate of interest under applicable law (the "**Maximum Permitted Rate**"), provided, however, that the Corporation shall take all such actions as may be necessary, including, without limitation, making any applicable governmental filings, to cause the Maximum Permitted Rate to be the highest possible rate. In the event any provision hereof would result in the rate of interest payable hereunder being in excess of the Maximum Permitted Rate, the amount of interest required to be paid hereunder shall automatically be reduced to eliminate such excess; provided, however, that any subsequent increase in the Maximum Permitted Rate shall be retroactively effective to the applicable Redemption Date to the extent permitted by law.

6.5    _Rights Subsequent to Redemption._ If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the Preferred Shares to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the Preferred Shares so called for redemption shall not have been surrendered, dividends with respect to such Preferred Shares shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

7.    _Redeemed or Otherwise Acquired Shares._ Any Preferred Shares that are redeemed, converted or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Preferred Shares following redemption, conversion or acquisition.

8.    _Waiver._ Except as otherwise set forth herein, (a) any of the rights, powers, preferences and other terms of the Preferred Shares set forth herein may be waived on behalf of all holders of Preferred Shares by the affirmative written consent or vote of the holders of at least a majority of the Preferred Shares then outstanding and (b) at any time more than one (1) series of Preferred Shares is issued and outstanding, any of the rights, powers, preferences and other terms of any series of Preferred Shares set forth herein may be waived on behalf of all holders of such series of Preferred Shares by the affirmative written consent or vote of the holders of at least a majority of the shares of such series of Preferred Shares then outstanding.

9.    _Notices._ Any notice required or permitted by the provisions of this Article Third to be given to a holder of Preferred Shares shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FOURTH:** Subject to any additional vote required by these Amended and Restated Articles of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**FIFTH:** Subject to any additional vote required by these Amended and Restated Articles of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation. Each director shall be entitled to one (1) vote on each matter presented to the Board of Directors; provided, however, that, so long as the holders of Preferred Shares are entitled to elect a Preferred Director, the affirmative vote of the Preferred Director shall be required for the authorization by the Board of Directors of any of the matters set forth in Section 5.5 of the Investors' Rights Agreement, dated as of October 29, 2020, by and among the Corporation and the other parties thereto, as such agreement may be amended from time to time.

**SIXTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide or if any shareholder demands such election by ballot at the meeting prior to voting.

**SEVENTH:** Meetings of shareholders may be held within or without the State of California, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of California at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**EIGHTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of California is amended after approval by the shareholders of this Article Eighth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Eighth by the shareholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**NINTH:** The following indemnification provisions shall apply to the persons enumerated below.

1.    Right to Indemnification of Directors and Officers. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an **"Indemnified Person"**) who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a **"Proceeding"**), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer

20

of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in <u>Section 3</u> of this Article Ninth the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

2.    <u>Prepayment of Expenses of Directors and Officers</u>.  The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, <u>provided</u>, <u>however</u>, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article Ninth or otherwise.

3.    <u>Claims by Directors and Officers</u>.  If a claim for indemnification or advancement of expenses under this Article Ninth is not paid in full within thirty (30) days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

4.    <u>Indemnification of Employees and Agents</u>.  The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding.  The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors. The Corporation is authorized to indemnify its agents (as defined in Section 317 of the General Corporation Law) for breach of duty to the Corporation and its shareholders, in excess of the indemnification expressly permitted by Section 317 of the General Corporation Law, subject to the exceptions for limitation of liability set forth in Section 204 of the General Corporation Law, the prohibitions on indemnification set forth in Section 317 of the General Corporation Law, and other applicable prohibitions and exceptions set forth in the General Corporation Law.

21

5.    <u>Advancement of Expenses of Employees and Agents</u>.  The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

6.    <u>Non-Exclusivity of Rights</u>.  The rights conferred on any person by this Article Ninth shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of these Amended and Restated Articles of Incorporation, the Bylaws of the Corporation, or any agreement, or pursuant to any vote of shareholders or disinterested directors or otherwise.

7.    <u>Other Indemnification</u>.  The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another Corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other Corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

8.    <u>Insurance</u>.  The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance:  (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article Ninth; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article Ninth.

9.    <u>Amendment or Repeal</u>.  Any repeal or modification of the foregoing provisions of this Article Ninth shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.  The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

**TENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Preferred Shares or any partner, member, director, shareholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in <u>clauses</u> (i) and <u>(ii)</u> are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Tenth will only be prospective and will not affect the rights under this Article Tenth in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding

anything to the contrary contained elsewhere in these Amended and Restated Articles of Incorporation, the affirmative vote of the holders of at least a majority of the Preferred Shares the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Tenth.

**ELEVENTH:** For purposes of Section 500 of the General Corporation Law, in connection with any repurchase of Common Shares permitted under these Amended and Restated Articles of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any other consent required under these Amended and Restated Articles of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the General Corporation Law). Accordingly, for purposes of making any calculation under Section 500 of the General Corporation Law in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

\* \* \*

3.      That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 902 of the General Corporation Law. The Corporation has only one class of shares and the total number of outstanding shares entitled to vote on the amendments is 10,000,000. The number of shares voting in favor of the amendments equaled or exceeded the vote required, which was a majority.

4.      That these Articles of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Articles of Incorporation, has been duly adopted in accordance with Sections 902 and 910 of the General Corporation Law.

[Signature Page Follows]

23

We further declare under penalty of perjury under the laws of the State of California that the matters set out in these Amended and Restated Articles of Incorporation are true and correct of our own knowledge.

Signed on this 29th day of October 2020 at Cupertino, California.

By: _____
Sowmya Arsikere Satish, President

By: _____
Rajashekar Basavaraju, Secretary

24



# State of California
## Secretary of State

### FILING OFFICE
### ADMINISTRATIVE ACTION STATEMENT

#### INTERNAL USE ONLY

**FILED**
Secretary of State
State of California

NOV 0 4 2020

1.  Identification of the Record to which this FILING OFFICE STATEMENT relates.

| 1a. DOCUMENT # (IF ANY) |
| --- |
| A0848663 |

| 1b. DATE RECORD FILED |
| --- |
| 10/29/2020 |

| 1c. FILE # TO WHICH THE RECORD RELATES |
| --- |
| C3844291 |

The Above Space For Filing Office Use Only

2.  Describe the inaccuracy or mistake on the part of the filing office.

    Date stamp error.

3.  Describe filing office administrative action taken.

    Corrected the file date from 11/02/2020.



I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

NOV 0 4 2020

Date: _____

By: _____
ALEX PADILLA, Secretary of State    WS

FILING CLERK    SW

FILING OFFICE COPY – FILING OFFICE ADMINISTRATIVE ACTION STATEMENT
FORM SHOULD BE TYPEWRITTEN OR COMPUTER GENERATED
BE FOS (REV 03/2011)



I hereby certify that the foregoing
transcript of_____ _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

**NOV 0 4 2020**

Date:_____

ALEX PADILLA, Secretary of State

## SERIES SEED PREFERRED STOCK PURCHASE AGREEMENT

This Series Seed Preferred Stock Purchase Agreement (this "**Agreement**"), is made as of is made as of October <u>29</u>, 2020, by and among Nestlings Inc, a California corporation (the "**Company**"), AnuPriya LLC, an Ohio limited liability company (the "**Purchaser**"), Rajashekar Basavaraju ("**Basavaraju**") and Sowmya Arsikere Satish ("**Satish**", each of Basavaraju and Satish being a "**Founder**" and, collectively, the "**Founders**").

The parties hereby agree as follows:

1.      <u>Purchase and Sale of Preferred Shares</u>.

    1.1    <u>Sale and Issuance of Preferred Shares</u>.

    (a)    The Company shall have adopted and filed with the Secretary of State of the State of California on or before the Initial Closing (as defined below) the Amended and Restated Articles of Incorporation in the form of <u>Exhibit A</u> attached to this Agreement (the "**Restated Articles**").

    (b)    Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase at the Initial Closing and the Company agrees to sell and issue to the Purchaser at the Initial Closing 3,771,213 Series Seed Preferred Shares, $0.0001 par value per share (the "**Series Seed Preferred Stock**"), in exchange for the following: (i) $299,999.98 shall be paid by Purchaser at the Initial Closing pursuant to <u>Section 1.2(b)</u> below (the "**Initial Closing Cash Payment**"); (ii) Purchaser shall coordinate and pay for the provision of the services described in <u>Exhibit G</u> which are to be performed prior to June 1, 2021 and which shall not exceed an aggregate fair market value of $150,000.00 for the same or similar services at customary market rates (the "**Market Value of Services**"), it being understood by the parties that the Market Value of Services is independent of the price actually paid by the Purchaser for such services, and the parties expressly acknowledge and agree that the Purchaser may obtain such services for free, at a discount or below market rates, including from sources that are Affiliates of or related to Purchaser, none of which shall have any effect on the determination of the Market Value of Services; (iii) Purchaser shall cause its wholly-owned subsidiary, AdmitAlly, LLC, to enter into the Securities Transfer Agreement, pursuant to which all outstanding capital stock of AdmitAlly Technology, Inc., a Delaware corporation, will be sold to the Company. The shares of Series Seed Preferred Stock issued to the Purchaser pursuant to this Agreement (including any shares issued at the Initial Closing and any Milestone Shares, as defined below) shall be referred to in this Agreement as the "**Shares**."

    1.2    <u>Closing; Delivery</u>.

    (a)    The initial purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 1:00 p.m. ET, on October <u>29</u>, 2020, or at such other time and place as the Company and the Purchaser mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**"). In the event there is more than one closing, the term "**Closing**" shall apply to each such closing unless otherwise specified.

    (b)    At each Closing, the Company shall deliver to the Purchaser a certificate representing the Shares being purchased by the Purchaser at such Closing against payment of the purchase price therefor by check payable to the Company, by wire transfer to a bank account designated by the Company, by cancellation or conversion of indebtedness or other convertible securities of the Company to Purchaser, or by any combination of such methods.

1.3     Milestone Payment. After the Initial Closing, the Company shall sell, and the Purchaser shall purchase, on the same terms and conditions as those contained in this Agreement, 942,803 additional shares of Series Seed Preferred Stock (the "**Milestone Shares**") for an aggregate purchase price of $299,999.91, on the certification by the Board of Directors that the events specified in Exhibit I attached to this Agreement have occurred (the "**Milestone Events**"). The date of the purchase and sale of the Milestone Shares are referred to in this Agreement as the "**Milestone Closing**."

1.4     Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of the Shares for product development and other general corporate purposes.

1.5     Defined Terms Used in this Agreement.  In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a)     "**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

(b)     "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one (1) or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

(c)     "**Code**" means the Internal Revenue Code of 1986, as amended.

(d)     "**Company Intellectual Property**" means all patents, patent applications, registered and unregistered trademarks, trademark applications, registered and unregistered service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and in any and all such cases that are owned or used by the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted.

(e)     "**Indemnification Agreement**" means the agreement between the Company and the director designated by the Purchaser entitled to designate a member of the Board of Directors pursuant to the Voting Agreement, dated as of the date of the Initial Closing, in the form of Exhibit C attached to this Agreement.

(f)     "**Investors' Rights Agreement**" means the agreement among the Company and the Purchaser and certain other stockholders of the Company dated as of the date of the Initial Closing, in the form of Exhibit D attached to this Agreement.

(g)     "**Key Employee**" means any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(h)    "**Knowledge**" including the phrase "**to the Company's knowledge**" shall mean the actual knowledge after reasonable investigation and assuming such knowledge as the individual would have as a result of the reasonable performance of his or her duties in the ordinary course of the following officers: Rajashekar Basavaraju and Sowmya Arsikere Satish.  Additionally, for purposes of Section 2.8, the Company shall be deemed to have "knowledge" of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws.

(i)    "**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided*, that "**Losses**" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a governmental authority or other third party.

(j)    "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Company.

(k)    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(l)    "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

(m)    "**Right of First Refusal and Co-Sale Agreement**" means the agreement among the Company, the Purchaser, and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit E attached to this Agreement.

(n)    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(o)    "**Securities Transfer Agreement**" means the agreement between the Company and AdmitAlly, LLC, dated as of the date of the Initial Closing, in the form of Exhibit H attached to this Agreement.

(p)    "**Transaction Agreements**" means this Agreement, the Investors' Rights Agreement, the Right of First Refusal and Co-Sale Agreement, the Voting Agreement, the Indemnification Agreement, and the Securities Transfer Agreement.

(q)    "**Voting Agreement**" means the agreement among the Company, the Purchaser and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit F attached to this Agreement.

2.    Representations and Warranties of the Company.  The Company hereby represents and warrants to the Purchaser that, except as set forth on the Disclosure Schedule attached as Exhibit B to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the applicable Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 2, and the disclosures in any section of the Disclosure Schedule shall qualify other sections in this Section 2 only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections .

For purposes of these representations and warranties (other than those in <u>Sections 2.2</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, and <u>2.6</u>), the term the "**Company**" shall include any subsidiaries of the Company, unless otherwise noted herein.

2.1 <u>Organization, Good Standing, Corporate Power and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all requisite corporate power and authority to carry on its business as now conducted and as presently proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2 <u>Capitalization</u>.

(a) The authorized capital of the Company consists, immediately prior to the Initial Closing, of:

(i) 15,714,016 common shares, $0.0001 par value per share (the "**Common Stock**"), 10,000,000 shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws.

(ii) 4,714,016 shares of Preferred Stock, all of which have been designated Series Seed Preferred Stock, none of which are issued and outstanding immediately prior to the Initial Closing. The rights, privileges and preferences of the Preferred Stock are as stated in the Restated Articles and as provided by the California General Corporation Law.

(b) The Company has reserved 1,000,000 shares of Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2016 Equity Incentive Plan, as amended by the First Amendment effective as of October <u>29</u>, 2020, duly adopted by the Board of Directors and approved by the Company stockholders (the "**Stock Plan**"). Of such reserved shares of Common Stock, zero shares have been issued pursuant to restricted stock purchase agreements, no options to purchase shares have been granted or are currently outstanding, and 1,000,000 shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The Company has furnished to the Purchaser complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(c) <u>Section 2.2(c)</u> of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Initial Closing including the number of shares of the following: (i) issued and outstanding Common Stock, including, with respect to restricted Common Stock, vesting schedule and repurchase price; (ii) outstanding stock options, including vesting schedule and exercise price; (iii) shares of Common Stock reserved for future award grants under the Stock Plan; (iv) each series of Preferred Stock; and (v) warrants or stock purchase rights, if any. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, (B) the rights provided in <u>Section 4</u> of the Investors' Rights Agreement, and (C) the securities and rights described in <u>Sections 2.2(a)(ii)</u> and <u>2.2(b)</u> of this Agreement and <u>Section 2.2(c)</u> of the Disclosure Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of Common Stock or Series Seed Preferred Stock, or any securities convertible into or exchangeable for shares of Common Stock or Series Seed Preferred Stock. All outstanding shares of the Company's Common Stock and all shares of the Company's Common Stock underlying outstanding options are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following the Company's

4

initial public offering pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act. Brain Share is not a shareholder of the Company and never was a shareholder of the Company, nor has Brain Share been promised any capital stock of the Company.

(d)    None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including, without limitation, in the case where the Company's Stock Plan is not assumed in an acquisition. The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means. Except as set forth in the Restated Articles, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(e)    409A.  The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(f)    The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3    Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4    Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Shares at the Closing and the Common Stock issuable upon conversion of the Shares, has been taken or will be taken prior to the applicable Closing. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the applicable Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investors' Rights Agreement and the Indemnification Agreement may be limited by applicable federal or state securities laws.

2.5    Valid Issuance of Shares.  The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchaser in Section 3 of this Agreement and subject to the filings described in the Voting Agreement, the Shares will be issued in compliance with all applicable federal and state securities laws. The Common Stock issuable upon

conversion of the Shares has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Articles, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchaser in <u>Section 3</u> of this Agreement and in the Voting Agreement, the Common Stock issuable upon conversion of the Shares will be issued in compliance with all applicable federal and state securities laws.

      2.6   <u>Governmental Consents and Filings</u>.  Assuming the accuracy of the representations made by the Purchaser in <u>Section 3</u> of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Articles, which will have been filed as of the Initial Closing, and (ii) filings pursuant to applicable securities laws, which have been made or will be made in a timely manner.

      2.7   <u>Litigation</u>.  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company arising out of their employment or board relationship with the Company; or (ii) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

      2.8   <u>Intellectual Property</u>.

      (a)   The Company owns or possesses or can acquire on commercially reasonable terms sufficient legal rights to all Company Intellectual Property without any known conflict with, or infringement of, the rights of others, including prior employees or consultants. The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person.

      (b)   No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of any other party.

      (c)   Other than with respect to commercially available software products under standard end-user object code license agreements, there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person.

(d)    The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business.

(e)    Each employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted and all intellectual property rights that he, she or it solely or jointly conceived, reduced to practice, developed or made during the period of his, her or its employment or consulting relationship with the Company that (i) relate, at the time of conception, reduction to practice, development, or making of such intellectual property right, to the Company's business as then conducted or as then proposed to be conducted, (ii) were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or information or (iii) resulted from the performance of services for the Company. To the Company's knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment by the Company, including prior employees or consultants.

(f)    Section 2.8(f) of the Disclosure Schedule lists all patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, tradenames, registered copyrights, and licenses to and under any of the foregoing, in each case owned by the Company.

(g)    The Company has not embedded, used or distributed any open source, copyleft or community source code (including but not limited to any libraries or code, software, technologies or other materials that are licensed or distributed under any General Public License, Lesser General Public License or similar license arrangement or other distribution model described by the Open Source Initiative at www.opensource.org, collectively "**Open Source Software**") in connection with any of its products or services that are generally available or in development in any manner that would materially restrict the ability of the Company to protect its proprietary interests in any such product or service or in any manner that requires, or purports to require (i) any Company IP (other than the Open Source Software itself) be disclosed or distributed in source code form or be licensed for the purpose of making derivative works; (ii) any restriction on the consideration to be charged for the distribution of any Company IP; (iii) the creation of any obligation for the Company with respect to Company IP owned by the Company, or the grant to any third party of any rights or immunities under Company IP owned by the Company; or (iv) any other limitation, restriction or condition on the right of the Company with respect to its use or distribution of any Company IP.

(h)    No government funding, facilities of a university, college, other educational institution or research center, or funding from third parties was used in the development of any Company Intellectual Property. No Person who was involved in, or who contributed to, the creation or development of any Company Intellectual Property, has performed services for the government, university, college, or other educational institution or research center in a manner that would affect Company's rights in the Company Intellectual Property.

2.9    Compliance with Other Instruments. The Company is not in violation or default (i) of any provisions of its Restated Articles or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will

not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10     Agreements; Actions.

(a)     Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (ii) except as set forth on Section 2.10(a)(ii) of the Disclosure Schedule, the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) except as set forth on Section 2.10(a)(iv) of the Disclosure Schedule, indemnification by the Company with respect to infringements of proprietary rights.

(b)     The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $20,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for business expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than in the ordinary course of business. For the purposes of (a) and (b) of this Section 2.10, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such section.

(c)     The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

(d)     The Company has not engaged in the past three (3) months in any discussion with any representative of any Person regarding (i) a sale or exclusive license of all or substantially all of the Company's assets, or (ii) any merger, consolidation or other business combination transaction of the Company with or into another Person.

2.11     Certain Transactions.

(a)     Other than (i) standard employee benefits generally made available to all employees, standard employee offer letters and Confidential Information Agreements (as defined below), (ii) standard director and officer indemnification agreements approved by the Board of Directors, (iii) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Company's Common Stock, in each instance, approved in the written minutes of the Board of Directors (previously provided to the Purchaser), and (iv) the Transaction Documents, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)     The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business

or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company except that directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract with the Company.

2.12    <u>Rights of Registration and Voting Rights</u>.  Except as provided in the Investors' Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

2.13    <u>Property</u>.  The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.14    <u>Financial Statements</u>.  The Company has delivered to the Purchaser its unaudited financial statements for the fiscal year ended December 31, 2019 and its unaudited financial statements (including balance sheet, income statement and statement of cash flows) as of June 30, 2020 (the "**Balance Sheet Date**") and for the six-month period ended on the Balance Sheet Date (collectively, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with generally accepted accounting principles ("**GAAP**") applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by GAAP. The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no material liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to the Balance Sheet Date; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under GAAP to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with GAAP.

2.15    <u>Changes</u>. Since the Balance Sheet Date there has not been:

(a)    any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

(b)        any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(c)        any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(d)        any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(e)        any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(f)        any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g)        any resignation or termination of employment of any officer or Key Employee of the Company;

(h)        any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i)        any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j)        any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(k)        any sale, assignment or transfer of any Company Intellectual Property that could reasonably be expected to result in a Material Adverse Effect;

(l)        receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)        any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(n)        any arrangement or commitment by the Company to do any of the things described in this <u>Section 2.15</u>.

2.16    <u>Employee Matters</u>.

(a)        None of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the

execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(b)     The Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(c)     To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing. The employment of each employee of the Company is terminable at the will of the Company. Except as set forth in Section 2.16(c)(i) of the Disclosure Schedule or as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. Except as set forth in Section 2.16(c)(ii) of the Disclosure Schedule, the Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(d)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of (or actions taken by unanimous written consent by) the Company's Board of Directors.

(e)     Each former Key Employee whose employment was terminated by the Company has entered into an agreement with the Company providing for the full release of any claims against the Company or any related party arising out of such employment.

(f)     Section 2.16(f) of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

(g)     To the Company's knowledge, none of the Key Employees or directors of the Company has been (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his or her business or property; (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits

11

or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

       2.17   <u>Tax Returns and Payments</u>. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

       2.18   <u>Insurance</u>.  The Company has in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company, with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed.

       2.19   <u>Employee Agreements</u>.  Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the Purchaser (the "**Confidential Information Agreements**"). No current or former Key Employee has excluded works or inventions from his or her assignment of inventions pursuant to such Key Employee's Confidential Information Agreement. Each current and former Key Employee has executed a non-competition and non-solicitation agreement substantially in the form or forms delivered to the Purchaser. The Company is not aware that any of its Key Employees is in violation of any agreement described in this <u>Section 2.19</u>.

       2.20   <u>Permits</u>.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

       2.21   <u>Corporate Documents</u>.  The Articles of Incorporation and Bylaws of the Company as of the date of this Agreement are in the form provided to the Purchaser. The copy of the minute books of the Company provided to the Purchaser contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders.

       2.22   <u>83(b) Elections</u>.  To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Company's Common Stock.

       2.23   <u>Foreign Corrupt Practices Act</u>. Neither the Company nor any of its directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii)

securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any person. Neither the Company nor any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. Neither the Company nor, to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anti-corruption law (collectively, "**Enforcement Action**").

2.24    Data Privacy. In connection with its collection, storage, use and/or disclosure of any information that constitutes "personal information," "personal data" or "personally identifiable information" as defined in applicable laws (collectively "**Personal Information**") by or on behalf of the Company, the Company is and has been, to the Company's knowledge, in compliance with (i) all applicable laws (including, without limitation, laws relating to privacy, data security, telephone and text message communications, and marketing by email or other channels) in all relevant jurisdictions, (ii) the Company's privacy policies and public written statements regarding the Company's privacy or data security practices, and (iii) the requirements of any contract codes of conduct or industry standards, by which the Company is bound. The Company maintains and has maintained reasonable physical, technical, and administrative security measures and policies designed to protect all Personal Information owned, stored, used, maintained or controlled by or on behalf of the Company from and against unlawful, accidental or unauthorized access, destruction, loss, use, modification and/or disclosure. The Company is and has been in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations. To the Company's knowledge, there has been no occurrence of (x) unlawful, accidental or unauthorized destruction, loss, use, modification or disclosure of or access to Personal Information owned, stored, used, maintained or controlled by or on behalf of the Company such that Privacy Requirements require or required the Company to notify government authorities, affected individuals or other parties of such occurrence or (y) unauthorized access to or disclosure of the Company's confidential information or trade secrets.

2.25    CFIUS Representations. The Company does not engage in (a) the design, fabrication, development, testing, production or manufacture of one (1) or more "critical technologies" within the meaning of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "**DPA**"); (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA. The Company has no current intention of engaging in such activities in the future.

2.26    Disclosure. The Company has made available to the Purchaser all the information that the Purchaser has requested for deciding whether to acquire the Shares, including certain of the Company's projections describing its proposed business plan (the "**Business Plan**"). No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. The Business Plan was prepared in good faith; however, the Company does not warrant that it will achieve any results projected in the Business Plan. It is understood that this representation is qualified by the fact that the Company has not delivered to the Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

3.    <u>Representations and Warranties of the Purchaser</u>. The Purchaser hereby represents and warrants to the Company that:

3.1    <u>Authorization</u>. The Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable against such Purchaser in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2    <u>Purchase Entirely for Own Account</u>. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3    <u>Disclosure of Information</u>. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of the Purchaser to rely thereon.

3.4    <u>Restricted Securities</u>. The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale except as set forth in the Investors' Rights Agreement. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5    <u>No Public Market</u>. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6    <u>Legends</u>. The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may be notated with one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(a)    Any legend set forth in, or required by, the other Transaction Agreements.

(b)    Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7    Accredited Investor. The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8    No General Solicitation. Neither the Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

3.9    Residence. The office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on the Purchaser's signature page attached hereto.

4.    Conditions to the Purchaser's Obligations at Closing. The obligations of the Purchaser to purchase Shares at the Initial Closing or any subsequent Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

4.1    Representations and Warranties. The representations and warranties of the Company contained in Section 2 shall be true and correct in all respects as of such Closing.

4.2    Performance. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

4.3    Compliance Certificate. The President of the Company shall deliver to the Purchaser at such Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of such Closing.

4.5    Opinion of Company Counsel. The Purchasers shall have received from Inventus Law, PC, counsel for the Company, an opinion, dated as of the Closing, in substantially the form of Exhibit J attached to this Agreement.

4.6     Board of Directors. As of the Initial Closing, the authorized size of the Board shall be three, and the Board shall be comprised of Raj Basavaraju, Sowmya Arsikere Satish and Anu Vora.

4.7     Indemnification Agreement. The Company shall have executed and delivered the Indemnification Agreements.

4.8     Investors' Rights Agreement. The Company and the Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder) and the other stockholders of the Company named as parties thereto shall have executed and delivered the Investors' Rights Agreement.

4.9     Right of First Refusal and Co-Sale Agreement. The Company, the Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.10    Voting Agreement. The Company, the Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.11    Restated Articles. The Company shall have filed the Restated Articles with the Secretary of State of California on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

4.12    Secretary's Certificate. The Secretary of the Company shall have delivered to the Purchaser at the Closing a certificate certifying (i) the Certificate of Incorporation and Bylaws of the Company as in effect at the Closing, (ii) resolutions of the Board of Directors of the Company approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, and (iii) resolutions of the stockholders of the Company approving the Restated Articles.

4.13    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested. Such documents may include good standing certificates.

5.      Conditions of the Company's Obligations at Closing. The obligations of the Company to sell Shares to the Purchaser at the Initial Closing or any subsequent Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1     Representations and Warranties. The representations and warranties of the Purchaser contained in Section 3 shall be true and correct in all respects as of such Closing.

5.2     Performance. The Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before such Closing.

5.3     Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

5.4     <u>Investors' Rights Agreement</u>. The Purchaser shall have executed and delivered the Investors' Rights Agreement.

5.5     <u>Right of First Refusal and Co-Sale Agreement</u>. The Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

5.6     <u>Voting Agreement</u>. The Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

6.     <u>Indemnification</u>. The Company and the Founders shall jointly and severally indemnify and defend Purchaser and its Affiliates and their respective Representatives (collectively, the "**Investor Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Investor Indemnitees based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any of the representations or warranties of the Company contained in <u>Section 2.2(c)</u> or <u>Section 2.2(f)</u> of this Agreement.

7.     <u>Miscellaneous</u>.

7.1     <u>Survival of Warranties</u>. Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and each Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchaser or the Company.

7.2     <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.3     <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of California, without regard to conflict of law principles that would result in the application of any law other than the law of the State of California.

7.4     <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

7.5     <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

7.6     <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested,

postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address or address as subsequently modified by written notice given in accordance with this Section 7.6. If notice is given to the Company, a copy (which copy shall not constitute notice) shall also be sent to Attn: Anil Advani, Esq., Inventus Law, PC., 3260 Hillview Avenue, Palo Alto, California 94304 and if notice is given to the Purchaser, a copy (which copy shall not constitute notice) shall also be given to Keating Muething & Klekamp PLL, One East Fourth Street, Suite 1400, Cincinnati, Ohio 45202, Attention: Michael J. Moeddel, Email: mmoeddel@kmklaw.com.

7.7    No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. The Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold harmless the Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

7.8    Fees and Expenses. At the Closing, the Company shall pay the reasonable fees and expenses of Keating Muething & Klekamp PLL, the counsel for the Purchaser, in an amount not to exceed, in the aggregate, $10,000.

7.9    Attorneys' Fees. If any action at law or in equity (including, arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

7.10    Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the Purchaser.

7.11    Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

7.12    Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

7.13    Entire Agreement. This Agreement (including the Exhibits hereto), the Restated Articles and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

7.14    <u>Termination of Closing Obligations</u>.    The Purchaser shall have the right to terminate its obligations to complete the Initial Closing or any subsequent Closing, as the case may be, if prior to the occurrence thereof, any of the following occurs:

(a)    the Company consummates a Deemed Liquidation Event (as defined in the Restated Articles);

(b)    the closing of an initial public offering of the Company, in which case the Purchaser may terminate their obligations hereunder immediately prior to, or contingent upon, such closing; or

(c)    the Company (i) applies for or consents to the appointment of a receiver, trustee, custodian or liquidator of itself or substantially all of its property, (ii) becomes subject to the appointment of a receiver, trustee, custodian or liquidator of itself or substantially all of its property, (iii) makes an assignment for the benefit of creditors, (iv) institutes any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally, or files a petition or answer seeking reorganization or an arrangement with creditors to take advantage of any insolvency law, or files an answer admitting the material allegations of a bankruptcy, reorganization or insolvency petition filed against it, or (v) becomes subject to any involuntary proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally, when proceeding is not dismissed within thirty (30) days of filing, or have an order for relief entered against it in any proceedings under the United States Bankruptcy Code.

7.15    <u>Dispute Resolution</u>.    The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Ohio and California and to the jurisdiction of the United States District Court for the Southern District of Ohio and the United States District Court for the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Ohio or California or the United States District Court for the Southern District of Ohio or the United States District Court for the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

       7.16   <u>No Commitment for Additional Financing</u>. The Company acknowledges and agrees that no Purchaser has made any representation, undertaking, commitment or agreement to provide or assist the Company in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, the Company acknowledges and agrees that (i) no statements, whether written or oral, made by the Purchaser or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment, (ii) the Company shall not rely on any such statement by the Purchaser or its representatives, and (iii) an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment may only be created by a written agreement, signed by the Purchaser and the Company, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. The Purchaser shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Series Seed Preferred Stock Purchase Agreement as of the date first written above.

**COMPANY:**

**NESTLINGS INC**

By: _Sowmya Arsikere Satish_
EDF8F27A69B24D8...

Name: Sowmya Arsikere Satish

Title: Chief Executive Officer

Address: 20661 Forge Way, Unit 160
Cupertino, CA 95014

IN WITNESS WHEREOF, the parties have executed this Series Seed Preferred Stock Purchase Agreement as of the date first written above.

**PURCHASER:**

**ANUPRIYA LLC**

By: _Anushree M Vora_____

Name: Anushree M. Vora

Title: Manager

Address: 10290 Alliance Road
              Cincinnati, OH 45242
              Attn: Anushree M. Vora

Email: avora@voraventures.com

<u>EXHIBIT A</u>

**FORM OF AMENDED AND RESTATED
ARTICLES OF INCORPORATION**

[See Tab 06]

EXHIBIT B

**DISCLOSURE SCHEDULE**

This Disclosure Schedule is made and given pursuant to Section 2 of the Series Seed Preferred Stock Purchase Agreement, dated as of October 2 9, 2020 (the "**Agreement**"), between Nestlings Inc (the "**Company**") and AnuPriya LLC. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided*, *however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure. Nothing in this Disclosure Schedule is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Disclosure Schedule (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item. This Disclosure Schedule includes brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request. Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided to the Purchaser or its counsel.

**Schedule 2.2(c) Capitalization**

Exhibit 2.2(c) contains the Company's Capitalization Table, which lays out the capitalization of the Company immediately following the Initial Closing.

**Schedule 2.2(d) Acceleration of Vesting**

All capitalized terms in the below disclosures shall have the meanings ascribed to them in the respective Restricted Stock Purchase Agreements.

- Pursuant to a Restricted Stock Purchase Agreement entered into by and between the Company and Stephanie Ortiz ("**Stephanie**") dated February 18, 2017, 86,000 Unvested Shares are subject to the following acceleration provisions:

  (1) Any Shares that are Unvested Shares on the date that is twelve (12) months after the consummation of a Change in Control of the Company shall vest and become Vested Shares on such date, provided that there has not been a Termination of Service of Purchaser prior to such date.

  (2) Upon Purchaser's Involuntary Termination in connection with, or within twelve (12) months following, a Change in Control, any Shares that are Unvested Shares as of the date of such Involuntary Termination shall vest and become Vested Shares as of such date.

- Pursuant to a Restricted Stock Purchase Agreement entered into by and between the Company and Troy Taylor ("**Troy**") dated April 17, 2017, 12,000 Unvested Shares are subject to the following acceleration provisions:

(1) Any Shares that are Unvested Shares on the date that is twelve (12) months after the consummation of a Change in Control of the Company shall vest and become Vested Shares on such date, provided that there has not been a Termination of Service of Purchaser prior to such date.

(2) Upon Purchaser's Involuntary Termination in connection with, or within twelve (12) months following, a Change in Control, any Shares that are Unvested Shares as of the date of such Involuntary Termination shall vest and become Vested Shares as of such date.

## Section 2.8(f) Intellectual Property

None

## Section 2.10 Material Agreements

**(a) (i)** The following agreement involves obligations of the Company in excess of $50,000:
- Memorandum of Understanding by and between the Company and CL Educated Ltd.

**(ii)** The Company has entered into certain agreements in the ordinary course of business with universities (the "Customers") pursuant to which the Customers have granted the Company a license to use their proprietary rights, including but not limited to the Customers' logos, trademarks and trade names in the course of performing the Company's services to its Customers. Some of those agreements are as follows:
- Agent Agreement by and between the Company and Centennial College of Applied Arts & Technology dated as of November 13, 2018.
- Agreement for Recruiting Services by and between the Company and San Jose State University Research Foundation dated as of June 18, 2018.
- Contract Number T192018 by and between the Company and State University of New York.
- Approved International Student Recruitment Counsellor Agreement by and among the Company and INTO University Partnerships Limited and IUP 2 LLP dated February 24, 2020.

**(a) (iv)** The Company has entered into certain agreements in the ordinary course of business with its Customers pursuant to which the Company is obligated to indemnify its Customers for infringement of the proprietary rights of any third parties in the course of performing the Company's services to its Customers. Such agreements include the following:
- Approved International Student Recruitment Counsellor Agreement by and among the Company and INTO University Partnerships Limited and IUP 2 LLP dated February 24, 2020.

**Exhibit 2.2(c)**

**Capitalization Table**

**Nestlings**
**Pro Forma Capitalization Table**

| | | |
|---|---|---|
| Post-money valuation | $ | 5,000,000.00 |
| New money raised | $ | 1,500,000.00 |
| Adjusted post-money shares | | 15,714,016 |
| Price per share | | $0.3182 |

| Securityholder Name | Pre-Financing | | | | Post-Initial Closing | | | Post-Milestone Closing | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Options/Restricted Stock | Common Stock | Common Equivalent | % of fully diluted | Series Seed Preferred Stock | Common Equivalent | % of fully diluted | Series Seed Preferred Stock | Common Equivalent | % of fully diluted |
| Rajashekar Basavaraju | | 4,933,500 | 4,933,500 | 44.85% | | 4,933,500 | 33.40% | | 4,933,500 | 31.40% |
| Sowmya Arsikere Satish | | 4,933,500 | 4,933,500 | 44.85% | | 4,933,500 | 33.40% | | 4,933,500 | 31.40% |
| Stephanie Ortiz | | 121,000 | 121,000 | 1.10% | | 121,000 | 0.82% | | 121,000 | 0.77% |
| Troy Taylor | | 12,000 | 12,000 | 0.11% | | 12,000 | 0.08% | | 12,000 | 0.08% |
| Issued Options/RSPAs | - | | | | | - | 0.00% | | - | 0.00% |
| AnuPriya LLC | | | | | 3,771,213 | 3,771,213 | 25.53% | 942,803 | 4,714,016 | 30.00% |
| **SUB-TOTAL OUTSTANDING STOCK** | - | 10,000,000 | 10,000,000 | 90.91% | 3,771,213 | 13,771,213 | 93.23% | 942,803 | 14,714,016 | 93.64% |
| Current Available Options | 500,000 | | 500,000 | 4.55% | | 1,000,000 | 6.77% | | 1,000,000 | 6.36% |
| Increase in Option Pool | 500,000 | | 500,000 | 4.55% | | | | | | |
| **TOTAL FULLY DILUTED** | 1,000,000 | 10,000,000 | 11,000,000 | 100.00% | 3,771,213 | 14,771,213 | 100.00% | 942,803 | 15,714,016 | 100.00% |

<u>EXHIBIT C</u>

**FORM OF INDEMNIFICATION AGREEMENT**

[See Tab 16]

EXHIBIT D

**FORM OF INVESTORS' RIGHTS AGREEMENT**

[See Tab 08]

<u>EXHIBIT E</u>

**FORM OF RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT**

[See Tab 09]

EXHIBIT F

**FORM OF VOTING AGREEMENT**

[See Tab 10]

EXHIBIT G

**DESCRIPTION OF SERVICES**

1) Design Services (up to 400 hours of Design Services)
   - Access to Product Design, Interaction Design, Website Design, and/or App
   - Design resources for Company's use

2) Development Services (up to 400 hours of Development Services)
   - Access to Architects, Developers, QA staff, Data Analysts and/or Product Managers for Company's use

3) UI/UX prototyping and user research (up to 100 hours of User Research services)
   - Access to researchers who can build prototypes and conduct user testing for Company

4) Management Services (up to 100 hours of Management Services)
   - Contract review and management assistance using Investor legal and business development professionals to Company for signing partnerships and/or services agreements to B2B customers
   - recruitment assistance using Investor HR Professionals including compensation packages and equity plan design for high growth ventures.

EXHIBIT H

**FORM OF SECURITIES TRANSFER AGREEMENT**

[See Tab 11]

<u>EXHIBIT I</u>

**MILESTONE EVENTS**

The Company has generated a revenue pipeline in an amount equal to **at least $150,000.00 in transaction fees**, license and/or subscription fees, in ordinary course of business, with respect to the trailing six-month period anytime prior to **1st May 2021**, as determined in good faith by the Company, and which could be a combination of any of the following: (i) 300 or more admission offers extended by universities or colleges from the USA or Canada; (ii) subscription fees from agents; (iii) commissions from student job placements; or (iv) visa assistance fees.

<u>EXHIBIT J</u>

**FORM LEGAL OPINION**

[See Tab 14]

## INVESTORS' RIGHTS AGREEMENT

THIS INVESTORS' RIGHTS AGREEMENT (this "**Agreement**"), is made as of October 29, 2020, by and among Nestlings Inc, a California corporation (the "**Company**"), and each of the investors listed on <u>Schedule A</u> hereto, each of which is referred to in this Agreement as an "**Investor**".

## RECITALS

**WHEREAS**, the Company and the Investors are parties to that certain Series Seed Preferred Stock Purchase Agreement of even date herewith (the "**Purchase Agreement**"); and

**WHEREAS**, in order to induce the Company to enter into the Purchase Agreement and to induce the Investors to invest funds in the Company pursuant to the Purchase Agreement, the Investors and the Company hereby agree that this Agreement shall govern the rights of the Investors to cause the Company to register shares of Common Stock issuable to the Investors, to receive certain information from the Company, and to participate in future equity offerings by the Company, and shall govern certain other matters as set forth in this Agreement;

**NOW, THEREFORE**, the parties hereby agree as follows:

1.      <u>Definitions</u>.  For purposes of this Agreement:

1.1      "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or other investment fund now or hereafter existing that is controlled by one or more general partners, managing members or investment adviser of, or shares the same management company or investment adviser with, such Person.

1.2      "**Articles of Incorporation**" means the Company's Amended and Restated Articles of Incorporation, as amended and/or restated from time to time.

1.3      "**Board of Directors**" means the board of directors of the Company.

1.4      "**Common Shares**" means the Company's common shares, par value $0.0001 per share.

1.5      "**Competitor**" means a Person engaged, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now existing or formed hereafter)), in student enrollment in higher education, but shall not include any financial investment firm or collective investment vehicle that, together with its Affiliates, holds less than twenty percent (20)% of the outstanding equity of any Competitor and does not, nor do any of its Affiliates, have a right to designate any members of the board of directors of any Competitor.

1.6      "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or

state law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon: (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto; (ii) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law.

1.7     "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), Common Shares, including options and warrants.

1.8     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.9     "**Excluded Registration**" means (i) a registration relating to the sale or grant of securities to employees of the Company or a subsidiary pursuant to a share option, share purchase, equity incentive or similar plan; (ii) a registration relating to an SEC Rule 145 transaction; (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or (iv) a registration in which the only Common Shares being registered is Common Shares issuable upon conversion of debt securities that are also being registered.

1.10    "**FOIA Party**" means a Person that, in the reasonable determination of the Board of Directors, may be subject to, and thereby required to disclose non-public information furnished by or relating to the Company under, the Freedom of Information Act, 5 U.S.C. 552 ("**FOIA**"), any state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement.

1.11    "**Form S-1**" means such form under the Securities Act as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.12    "**Form S-3**" means such form under the Securities Act as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits forward incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.13    "**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

1.14    "**Holder**" means any holder of Registrable Securities who is a party to this Agreement.

1.15    "**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, life partner or similar statutorily-recognized domestic partner,

sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships of a natural person referred to herein.

1.16    "**Initiating Holders**" means, collectively, Holders who properly initiate a registration request under this Agreement.

1.17    "**IPO**" means the Company's first underwritten public offering of its Common Shares under the Securities Act.

1.18    "**Key Employee**" means any executive-level employee (including division director and vice president-level positions) as well as any employee who, either alone or in concert with others, develops, invents, programs, or designs any Company Intellectual Property (as defined in the Purchase Agreement).

1.19    "**Major Investor**" means any Investor that, individually or together with such Investor's Affiliates, holds at least 500,000 shares of Registrable Securities (as adjusted for any share split, share dividend, combination, or other recapitalization or reclassification effected after the date hereof).

1.20    "**New Securities**" means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

1.21    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

1.22    "**Preferred Director**" means any director of the Company that the holders of record of Preferred Shares are entitled to elect, exclusively and as a separate class, pursuant to the Articles of Incorporation.

1.23    "**Preferred Shares**" means, collectively, the Company's Preferred Shares, par value $0.0001 per share.

1.24    "**Registrable Securities**" means (i) the Common Shares issuable or issued upon conversion of the Preferred Shares, excluding any Common Shares issued upon conversion of the Preferred Shares pursuant to the "**Mandatory Conversion**" provisions of the Articles of Incorporation; (ii) any Common Shares, or any Common Shares issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by the Investors after the date hereof; and (iii) any Common Shares issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clauses (i) and (ii) above; excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Section 6.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Section 2.13 of this Agreement.

3

1.25    "**Registrable Securities then outstanding**" means the number of shares determined by adding the number of outstanding Common Shares that are Registrable Securities and the number of Common Shares issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.26    "**Restricted Securities**" means the securities of the Company required to be notated with the legend set forth in Section 2.12(b) hereof.

1.27    "**SEC**" means the Securities and Exchange Commission.

1.28    "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

1.29    "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.30    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.31    "**Selling Expenses**" means all underwriting discounts, selling commissions, and share transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Section 2.6.

2.    Registration Rights. The Company covenants and agrees as follows:

2.1    Demand Registration.

(a)    Form S-1 Demand. If the Company receives a request from Holders of at least fifty percent (50%) of the Registrable Securities then outstanding that the Company file a Form S-1 registration statement with respect to at least thirty percent (30%) of the Registrable Securities then outstanding having an aggregate offering price to the public of not less than five million dollars, then the Company shall: (x) within ten (10) days after the date such request is given, give notice thereof (the "**Demand Notice**") to all Holders other than the Initiating Holders; and (y) as soon as practicable, and in any event within sixty (60) days after the date such request is given by the Initiating Holders, file a Form S-1 registration statement under the Securities Act covering all Registrable Securities that the Initiating Holders requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Sections 2.1(c) and 2.3.

(b)    Form S-3 Demand. If at any time when it is eligible to use a Form S-3 registration statement, the Company receives a request from Holders of at least fifty percent (50%) of the Registrable Securities then outstanding that the Company file a Form S-3 registration statement with respect to outstanding Registrable Securities of such Holders having an anticipated aggregate offering price of five hundred thousand dollars, then the Company shall (i) within ten (10) days after the date such request is given, give a Demand Notice to all Holders other than the

Initiating Holders; and (ii) as soon as practicable, and in any event within forty-five (45) days after the date such request is given by the Initiating Holders, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Sections 2.1(c) and 2.3.

(c)     Notwithstanding the foregoing obligations, if the Company furnishes to Holders requesting a registration pursuant to this Section 2.1 a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Board of Directors it would be materially detrimental to the Company and its shareholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act, then the Company shall have the right to defer taking action with respect to such filing, for a period of not more than ninety (90) days after the request of the Initiating Holders is given; provided, however, that the Company may not invoke this right more than twice in any twelve (12) month period; and provided further that the Company shall not register any securities for its own account or that of any other shareholder during such ninety (90) day period other than an Excluded Registration.

(d)     The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(a), (i) during the one hundred eighty (180) day period commencing with the date of the Company's IPO, (ii) after the Company has effected two (2) registrations pursuant to Section 2.1(a); or (iii) if the Company delivers notice to the holders of the Registrable Securities within thirty (30) days of any registration request of the Company's intent to file a registration statement for such IPO within ninety (90) days. The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(b), (i) during the one hundred eighty (180) day period commencing with the date of the Company's IPO, (ii) after the Company has effected two (2) registrations pursuant to Section 2.1(b) in such fiscal year; or (iii) if the Company delivers notice to the holders of the Registrable Securities within thirty (30) days of any registration request of the Company's intent to file a registration statement for such IPO within ninety (90) day. A registration shall not be counted as "effected" for purposes of this Section 2.1(d) until such time as the applicable registration statement has been declared effective by the SEC, unless the Initiating Holders withdraw their request for such registration, elect not to pay the registration expenses therefor, and forfeit their right to one demand registration statement pursuant to Section 2.6, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Section 2.1(d); provided, that if such withdrawal is during a period the Company has deferred taking action pursuant to Section 2.1(c), then the Initiating Holders may withdraw their request for registration and such registration will not be counted as "effected" for purposes of this Section 2.1(d).

2.2     Company Registration. If the Company proposes to register (including for this purpose a registration effected by the Company for shareholders other than the Holders) any of its securities under the Securities Act in connection with the public offering of such securities solely

for cash (other than in an Excluded Registration), the Company shall, at such time, promptly give each Holder notice of such registration. Upon the request of each Holder given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Section 2.3, cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Section 2.6.

2.3    Underwriting Requirements.

(a)    If, pursuant to Section 2.1, the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2.1, and the Company shall include such information in the Demand Notice. The underwriter(s) will be selected by the Initiating Holders, subject only to the reasonable approval of the Company. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Section 2.4(e)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting; provided, however, that no Holder (or any of their assignees) shall be required to make any representations, warranties or indemnities except as they relate to such Holder's ownership of shares and authority to enter into the underwriting agreement and to such Holder's intended method of distribution, and the liability of such Holder shall be several and not joint, and limited to an amount equal to the net proceeds from the offering received by such Holder. Notwithstanding any other provision of this Section 2.3, if the managing underwriter(s) advise(s) the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, then the Initiating Holders shall so advise all Holders of Registrable Securities that otherwise would be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated among such Holders of Registrable Securities, including the Initiating Holders, in proportion (as nearly as practicable) to the number of Registrable Securities owned by each Holder or in such other proportion as shall mutually be agreed to by all such selling Holders; provided, however, that the number of Registrable Securities held by the Holders to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.

(b)    In connection with any offering involving an underwriting of shares of the Company's shares pursuant to Section 2.2, the Company shall not be required to include any of the Holders' Registrable Securities in such underwriting unless the Holders accept the terms of the underwriting as agreed upon between the Company and its underwriters, and then only in such quantity as the underwriters in their sole discretion determine will not jeopardize the success of the offering by the Company. If the total number of securities, including Registrable Securities, requested by shareholders to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the

offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated among the selling Holders in proportion (as nearly as practicable to) the number of Registrable Securities owned by each selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders. Notwithstanding the foregoing, in no event shall (i) the number of Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, or (ii) the number of Registrable Securities included in the offering be reduced below thirty percent (30%) of the total number of securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above and no other shareholder's securities are included in such offering. For purposes of the provision in this Section 2.3(b) concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, shareholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence.

(c)      For purposes of Section 2.1, a registration shall not be counted as "effected" if, as a result of an exercise of the underwriter's cutback provisions in Section 2.3(a), fewer than fifty percent (50%) of the total number of Registrable Securities that Holders have requested to be included in such registration statement are actually included.

2.4    Obligations of the Company.  Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)      prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to one hundred twenty (120) days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the Holder refrains, at the request of an underwriter of Common Shares (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such one hundred twenty (120) day period shall be extended as necessary, to keep the registration statement effective until all such Registrable Securities are sold;

(b)      prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as

7

may be necessary to comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

        (c)    furnish to the selling Holders such numbers of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

        (d)    use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the selling Holders, <u>provided</u> that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

        (e)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

        (f)    use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

        (g)    provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

        (h)    promptly make available for inspection by the selling Holders, any managing underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

        (i)    notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

        (j)    after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

    In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act shall have become

effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act.

2.5    <u>Furnish Information</u>. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this <u>Section 2</u> with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

2.6    <u>Expenses of Registration</u>. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to <u>Section 2</u>, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements of one counsel for the selling Holders ("**Selling Holder Counsel**"), shall be borne and paid by the Company; <u>provided</u>, <u>however</u>, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to <u>Section 2.1</u> if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all selling Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to one registration pursuant to <u>Sections 2.1(a)</u> or <u>2.1(b)</u>, as the case may be; <u>provided</u> <u>further</u> that if, at the time of such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information then the Holders shall not be required to pay any of such expenses and shall not forfeit their right to one registration pursuant to <u>Sections 2.1(a)</u> or <u>2.1(b)</u>. All Selling Expenses relating to Registrable Securities registered pursuant to this <u>Section 2</u> (other than fees and disbursements of counsel to any Holder, other than the Selling Holder Counsel, which shall be borne solely by the Holder engaging such counsel) shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.

2.7    <u>Delay of Registration</u>. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this <u>Section 2</u>.

2.8    <u>Indemnification</u>. If any Registrable Securities are included in a registration statement under this <u>Section 2</u>:

(a)    To the extent permitted by law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, officers, directors, and shareholders of each such Holder; legal counsel and accountants for each such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; <u>provided</u>, <u>however</u>, that the indemnity agreement contained in this <u>Section</u>

2.8(a) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration.

(b)    To the extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Section 2.8(b) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and provided further that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under Section 2.8(b) and 2.8(d) exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or willful misconduct by such Holder.

(c)    Promptly after receipt by an indemnified party under this Section 2.8 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.8, give the indemnifying party notice of the commencement thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.8, only to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. The failure to give notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.8.

(d)    To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either: (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this <u>Section 2.8</u> but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this <u>Section 2.8</u> provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this <u>Section 2.8</u>, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim, damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; <u>provided, however</u>, that, in any such case (x) no Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and <u>provided further</u> that in no event shall a Holder's liability pursuant to this <u>Section 2.8(d)</u>, when combined with the amounts paid or payable by such Holder pursuant to <u>Section 2.8(b)</u>, exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of willful misconduct or fraud by such Holder.

(e)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control; <u>provided, however</u>, that any matter expressly provided for or addressed by the foregoing provisions that is not expressly provided for or addressed by the underwriting agreement shall be controlled by the foregoing provisions.

(f)    Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this <u>Section 2.8</u> shall survive the completion of any offering of Registrable Securities in a registration under this <u>Section 2</u>, and otherwise shall survive the termination of this Agreement or any provision(s) of this Agreement.

2.9    <u>Reports Under Exchange Act</u>. With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company shall:

(a)    make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO;

(b)    use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)    furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety (90) days after the effective date of the registration statement filed by the Company for the IPO), the Securities Act, and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company; and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

2.10    <u>Limitations on Subsequent Registration Rights</u>. From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of a majority of the Registrable Securities then outstanding, enter into any agreement with any holder or prospective holder of any securities of the Company that would (i) allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of the Registrable Securities of the Holders that are included; or (ii) allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; <u>provided</u> that this limitation shall not apply to Registrable Securities acquired by any additional Investor that becomes a party to this Agreement in accordance with <u>Section 6.9</u>.

2.11    <u>"Market Stand-off" Agreement</u>. Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the registration by the Company for its own behalf of its Common Shares or any other equity securities under the Securities Act on a registration statement on Form S-1 or Form S-3, and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days in the case of the IPO or ninety (90) days in the case of any registration other than the IPO, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in applicable FINRA rules, or any successor provisions or amendments thereto), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any Common Shares or any securities

convertible into or exercisable or exchangeable (directly or indirectly) for Common Shares held immediately before the effective date of the registration statement for such offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Shares or other securities, in cash, or otherwise. The foregoing provisions of this Section 2.11 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, or the transfer of any shares to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, and shall be applicable to the Holders only if all officers and directors are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all shareholders individually owning more than one percent (1%) of the Company's outstanding Common Shares (after giving effect to conversion into Common Shares of all outstanding Preferred Shares). The underwriters in connection with such registration are intended third-party beneficiaries of this Section 2.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Section 2.11 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Company shareholders that are subject to such agreements, based on the number of shares subject to such agreements.

2.12    Restrictions on Transfer.

(a)    The Preferred Shares and the Registrable Securities shall not be sold, pledged, or otherwise transferred, and the Company shall not recognize and shall issue stop-transfer instructions to its transfer agent with respect to any such sale, pledge, or transfer, except upon the conditions specified in this Agreement, which conditions are intended to ensure compliance with the provisions of the Securities Act. A transferring Holder will cause any proposed purchaser, pledgee, or transferee of the Preferred Shares and the Registrable Securities held by such Holder to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement.

(b)    Each certificate, instrument, or book entry representing (i) the Preferred Shares, (ii) the Registrable Securities, and (iii) any other securities issued in respect of the securities referenced in clauses (i) and (ii), upon any share split, share dividend, recapitalization, merger, consolidation, or similar event, shall (unless otherwise permitted by the provisions of Section 2.12(c)) be notated with a legend substantially in the following form:

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD, PLEDGED, OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR A VALID EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.

THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE SHAREHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

The Holders consent to the Company making a notation in its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer set forth in this Section 2.12.

(c)     The holder of such Restricted Securities, by acceptance of ownership thereof, agrees to comply in all respects with the provisions of this Section 2. Before any proposed sale, pledge, or transfer of any Restricted Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction, the Holder thereof shall give notice to the Company of such Holder's intention to effect such sale, pledge, or transfer. Each such notice shall describe the manner and circumstances of the proposed sale, pledge, or transfer in sufficient detail and, if reasonably requested by the Company, shall be accompanied at such Holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, addressed to the Company, to the effect that the proposed transaction may be effected without registration under the Securities Act; (ii) a "no action" letter from the SEC to the effect that the proposed sale, pledge, or transfer of such Restricted Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (iii) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale, pledge, or transfer of the Restricted Securities may be effected without registration under the Securities Act, whereupon the Holder of such Restricted Securities shall be entitled to sell, pledge, or transfer such Restricted Securities in accordance with the terms of the notice given by the Holder to the Company. The Company will not require such a notice, legal opinion or "no action" letter (x) in any transaction in compliance with SEC Rule 144; or (y) in any transaction in which such Holder distributes Restricted Securities to an Affiliate of such Holder for no consideration; provided that each transferee agrees in writing to be subject to the terms of this Section 2.12. Each certificate, instrument, or book entry representing the Restricted Securities transferred as above provided shall be notated with, except if such transfer is made pursuant to SEC Rule 144, the appropriate restrictive legend set forth in Section 2.12(b), except that such certificate instrument, or book entry shall not be notated with such restrictive legend if, in the opinion of counsel for such Holder and the Company, such legend is not required in order to establish compliance with any provisions of the Securities Act.

2.13     Termination of Registration Rights. The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Sections 2.1 or 2.2 shall terminate upon the earliest to occur of:

(a)     the closing of a Deemed Liquidation Event, as such term is defined in the Articles of Incorporation, in which the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities, or if the Investors receive registration rights from the acquiring company or other successor to the Company reasonably comparable to those set forth in this Section 2;

(b)     such time after consummation of the IPO as SEC Rule 144 or another similar exemption under the Securities Act is available for the sale of all of such Holder's shares without limitation, during a three (3)-month period without registration;

(c)     the fifth (5ᵗʰ) anniversary of the IPO (or such later date that is one hundred eighty (180) days following the expiration of all deferrals of the Company's obligations pursuant to <u>Section 2</u> that remain in effect as of the fifth (5ᵗʰ) anniversary of the consummation of the IPO).

3.     <u>Information and Observer Rights</u>.

3.1     <u>Delivery of Financial Statements</u>. The Company shall deliver to each Investor:

(a)     as soon as practicable, but in any event within one hundred twenty (120) days after the end of each fiscal year of the Company unaudited statements of income and cash flows for such year, and an unaudited balance sheet as of the end of such year, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments; and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(b)     as soon as practicable, but in any event within forty-five (45) days after the end of each quarter of each fiscal year of the Company, unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments; and (ii) not contain all notes thereto that may be required in accordance with GAAP); and

(c)     as soon as practicable, but in any event thirty (30) days before the end of each fiscal year, a budget and business plan for the next fiscal year, prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months, and promptly after prepared, any other budgets or revised budgets prepared by the Company (such budget and business plan that is approved by the Board of Directors is collectively referred to herein as the "**Budget**").

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

Notwithstanding anything else in this <u>Section 3.1</u> to the contrary, the Company may cease providing the information set forth in this <u>Section 3.1</u> during the period starting with the date thirty (30) days before the Company's good-faith estimate of the date of filing of a registration statement if it reasonably concludes it must do so to comply with the SEC rules applicable to such registration statement and related offering; <u>provided</u> that the Company's covenants under this <u>Section 3.1</u> shall be reinstated at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective.

3.2     <u>Inspection</u>. The Company shall permit each Major Investor, at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account

and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; provided, however, that the Company shall not be obligated pursuant to this Section 3.2 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

3.3    Termination of Information Rights. The covenants set forth in Section 3.1 and Section 3.2 shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon the closing of a Deemed Liquidation Event, as such term is defined in the Articles of Incorporation, whichever event occurs first; provided, that, with respect to clause (iii), the covenants set forth in Section 3.1 shall only terminate if the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities or if the Investors receive financial information from the acquiring company or other successor to the Company comparable to those set forth in Section 3.1.

3.4    Confidentiality. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 3.2 by such Investor),(b) is or has been independently developed or conceived by such Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to such Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent reasonably necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this Section 3.2; (iii) to any Affiliate, partner, member, shareholder, or wholly owned subsidiary of such Investor in the ordinary course of business, provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, regulation, rule, court order or subpoena, provided that such Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

4.    Rights to Future Share Issuances.

4.1    Right of First Offer. Subject to the terms and conditions of this Section 4.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities, the Company shall first offer such New Securities to each Major Investor.  A Major Investor shall be entitled to apportion the right of first offer hereby granted to it in such proportions as it deems appropriate, among (i) itself, (ii) its Affiliates and (iii) its beneficial interest holders, such as limited

partners, members or any other Person having "beneficial ownership," as such term is defined in Rule 13d-3 promulgated under the Exchange Act, of such Major Investor ("**Investor Beneficial Owners**"); <u>provided</u> that each such Affiliate or Investor Beneficial Owner (x) is not a Competitor or FOIA Party, unless such party's purchase of New Securities is otherwise consented to by the Board of Directors, and (y) agrees to enter into this Agreement and each of the Voting Agreement of even date herewith among the Company, the Investors and the other parties named therein, as an "**Investor**" under each such agreement (<u>provided</u> that any Competitor or FOIA Party shall not be entitled to any rights as a Major Investor under <u>Sections 3.1</u> and <u>4.1</u> hereof).

(a)    The Company shall give notice (the "**Offer Notice**") to each Major Investor, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b)    By notification to the Company within twenty (20) days after the Offer Notice is given, each Major Investor may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Common Shares then held by such Major Investor (including all Common Shares then issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Shares and any other Derivative Securities then held by such Major Investor) bears to the total Common Shares of the Company then outstanding (assuming full conversion and/or exercise, as applicable, of all Preferred Shares and any other Derivative Securities then outstanding). At the expiration of such twenty (20) day period, the Company shall promptly notify each Major Investor that elects to purchase or acquire all the shares available to it (each, a "**Fully Exercising Investor**") of any other Major Investor's failure to do likewise. During the ten (10) day period commencing after the Company has given such notice, each Fully Exercising Investor may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of shares specified above, up to that portion of the New Securities for which Major Investors were entitled to subscribe but that were not subscribed for by the Major Investors which is equal to the proportion that the Common Shares issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of Preferred Shares and any other Derivative Securities then held, by such Fully Exercising Investor bears to the Common Shares issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Shares and any other Derivative Securities then held, by all Fully Exercising Investors who wish to purchase such unsubscribed shares. The closing of any sale pursuant to this <u>Section 4.1(b)</u> shall occur within the later of one hundred twenty 120) days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to <u>Section 4.1(c)</u>.

(c)    If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in <u>Section 4.1(b)</u>, the Company may, during the ninety (90) day period following the expiration of the periods provided in <u>Section 4.1(b)</u>, offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within thirty (30) days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Major Investors in accordance with this <u>Section 4.1</u>.

(d)    The right of first offer in this <u>Section 4.1</u> shall not be applicable to (i) Exempted Securities (as defined in the Articles of Incorporation); and (ii) Common Shares issued in the IPO.

4.2    <u>Termination</u>. The covenants set forth in <u>Section 4.1</u> shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, or (ii) upon the closing of a Deemed Liquidation Event, as such term is defined in the Articles of Incorporation, whichever event occurs first.

5.    <u>Additional Covenants</u>.

5.1    <u>Insurance</u>. The Company shall obtain, within ninety (90) days of the date hereof, from financially sound and reputable insurers Directors and Officers liability insurance and term "key person" insurance on each of Sowmya Satish and Rajashekar Basavaraju, each in the amount of $500,000 and on terms and conditions satisfactory to the Board of Directors, and will use commercially reasonable efforts to cause such insurance policies to be maintained until such time as the Board of Directors determines that such insurance should be discontinued. The key person policy shall name the Company as loss payee, and neither policy shall be cancelable by the Company without prior approval by the Board of Directors and holders of a majority of the Preferred Shares. Notwithstanding any other provision of this <u>Section 5.1</u> to the contrary, for so long as a Preferred Director is serving on the Board of Directors, the Company shall not cease to maintain a Directors and Officers liability insurance policy in an amount of at least $1,500,000 unless approved by such Preferred Director, shall include the Investors entitled to designate the Preferred Director pursuant to the Voting Agreement as additional insureds in such policy, and shall annually, within one hundred twenty (120) days after the end of each fiscal year of the Company, deliver to the Investors a certification that such a Directors and Officers liability insurance policy remains in effect. Each Key Holder hereby covenants and agrees that, to the extent such Key Holder is named under such key person policy, such Key Holder will execute and deliver to the Company, as reasonably requested, a written notice and consent form with respect to such policy.

5.2    <u>Employee Agreements</u>. Unless otherwise approved by the Board of Directors, including the Requisite Preferred Director Vote, the Company will cause (i) each Person now or hereafter employed by it or by any subsidiary (or engaged by the Company or any subsidiary as a consultant/independent contractor) with access to confidential information and/or trade secrets to enter into a nondisclosure, proprietary rights assignment and non-solicitation agreement; and (ii) each Key Employee to enter into a noncompetition designed with the advice of counsel. In addition, the Company shall not amend, modify, terminate, waive, or otherwise alter, in whole or in part, any of the above-referenced agreements or any restricted share agreement between the Company and any employee, without the consent of the Board of Directors, including the Requisite Preferred Director Vote.

5.3    <u>Employee Shares</u>. Unless otherwise approved by the Board of Directors, including the Requisite Preferred Director Vote, all employees of the Company who purchase, receive options to purchase, or receive awards of the Company's capital shares after the date hereof shall be required to execute restricted share or option agreements, as applicable, providing for (i) vesting of shares in accordance with the Company's stock option plan, and (ii) a market stand-off provision

18

substantially similar to that in <u>Section 2.11</u>. Without the prior approval by the Board of Directors, including the Requisite Preferred Director Vote, the Company shall not amend, modify, terminate, waive or otherwise alter, in whole or in part, any share purchase, share restriction or option agreement with any existing employee or service provider if such amendment would cause it to be inconsistent with this <u>Section 5.3</u>. In addition, unless otherwise approved by the Board of Directors, including the Requisite Preferred Director Vote, the Company (x) shall not offer or allow any acceleration of vesting, and (y) shall retain (and not waive) a "right of first refusal" on employee transfers until the Company's IPO and shall have the right to repurchase unvested shares at cost upon termination of employment of a holder of restricted shares.

5.4    <u>Qualified Small Business Shares</u>. The Company shall use commercially reasonable efforts to cause the Preferred Shares issued pursuant to the Purchase Agreement, as well as any shares into which such shares are converted, within the meaning of Section 1202(f) of the Internal Revenue Code (the "**Code**"), to constitute "qualified small business stock" as defined in Section 1202(c) of the Code; <u>provided</u>, <u>however</u>, that such requirement shall not be applicable if the Board of Directors determines, in its good-faith business judgment, that such qualification is inconsistent with the best interests of the Company. The Company shall submit to its shareholders (including the Investors) and to the Internal Revenue Service any reports that may be required under Section 1202(d)(1)(C) of the Code and the regulations promulgated thereunder. In addition, within (a) twenty (20) business days after any Investor's written request therefor and (b) twenty (20) business days before the consummation of a Deemed Liquidation Event (as defined in the Articles of Incorporation) or IPO, the Company shall deliver to the Investors a certificate in substantially the form of <u>Annex 1</u>. The Company shall use commercially reasonable efforts to ensure the accuracy of any such statement and any such factual information, but in no event shall the Company be liable to the Investors for any damages arising from any errors in the Company's determination with respect to the applicability or interpretation of Section 1202 of the Code, unless such determination shall have been given by the Company in a manner either grossly negligent or fraudulent.

5.5    <u>Matters Requiring Preferred Director Approval</u>. During such time or times as the holders of Preferred Shares are entitled to elect a Preferred Director and such seat is filled, the Company hereby covenants and agrees with each of the Investors that it shall not, without approval of the Board of Directors, which approval must include the Requisite Preferred Director Vote:

(a)    make, or permit any subsidiary to make, any loan or advance to, or own any shares or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;

(b)    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee share or option plan approved by the Board of Directors;

(c)    guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

19

(d)    incur any aggregate indebtedness in excess of $100,000 that is not already included in the Budget (as defined in <u>Section 3.1(c)</u>), other than trade credit incurred in the ordinary course of business;

(e)    hire, terminate, or change the compensation of the executive officers, including approving any option grants or share awards to executive officers;

(f)    change the principal business of the Company, enter new lines of business, or exit the current line of business;

(g)    sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business; or

(h)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $250,000.

5.6    <u>Board Matters</u>. The Company shall reimburse the nonemployee directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors.

5.7    <u>Successor Indemnification</u>. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, the Articles of Incorporation, or elsewhere, as the case may be.

5.8    <u>Expenses of Counsel</u>. In the event of a transaction which is a Sale of the Company (as defined in the Voting Agreement of even date herewith among the Investors, the Company and the other parties named therein), the reasonable fees and disbursements of one counsel for the Investors ("**Investor Counsel**"), in their capacities as shareholders, shall be borne and paid by the Company. At the outset of considering a transaction which, if consummated would constitute a Sale of the Company, the Company shall obtain the ability to share with the Investor Counsel (and such counsel's clients) and shall share the confidential information (including, without limitation, the initial and all subsequent drafts of memoranda of understanding, letters of intent and other transaction documents and related noncompete, employment, consulting and other compensation agreements and plans) pertaining to and memorializing any of the transactions which, individually or when aggregated with others would constitute the Sale of the Company. The Company shall be obligated to share (and cause the Company's counsel and investment bankers to share) such materials when distributed to the Company's executives and/or any one (1) or more of the other parties to such transaction(s). In the event that Investor Counsel deems it appropriate, in its reasonable discretion, to enter into a joint defense (or common interest) agreement or other arrangement to enhance the ability of the parties to protect their communications and other reviewed materials under the attorney client privilege, the Company shall, and shall direct its counsel to, execute and deliver to Investor Counsel and its clients such an agreement in form and

substance reasonably acceptable to Investor Counsel and the Company's counsel. In the event that one (1) or more of the other party or parties to such transactions require the clients of Investor Counsel to enter into a confidentiality agreement and/or joint defense (or common interest) agreement in order to receive such information, then the Company shall share whatever information can be shared without entry into such agreement and shall, at the same time, in good faith work expeditiously to enable Investor Counsel and its clients to negotiate and enter into the appropriate agreement(s) without undue burden to the clients of Investor Counsel.

5.9    <u>Indemnification Matters</u>. The Company hereby acknowledges that the Preferred Director nominated to serve on the Board of Directors by one (1) or more Investors may have certain rights to indemnification, advancement of expenses and/or insurance provided by one (1) or more of the Investors and certain of their Affiliates (collectively, the "**Investor Indemnitors**"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to the Preferred Director are primary and any obligation of the Investor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Preferred Director are secondary), (b) that it shall be required to advance the full amount of expenses incurred by the Preferred Director and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement by or on behalf of the Preferred Director to the extent legally permitted and as required by the Articles of Incorporation or Bylaws of the Company (or any agreement between the Company and the Preferred Director), without regard to any rights such Preferred Director may have against the Investor Indemnitors, and, (c) that it irrevocably waives, relinquishes and releases the Investor Indemnitors from any and all claims against the Investor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Investor Indemnitors on behalf of such Preferred Director with respect to any claim for which such Preferred Director has sought indemnification from the Company shall affect the foregoing and the Investor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Preferred Director against the Company. The Preferred Director and the Investor Indemnitors are intended third-party beneficiaries of this <u>Section 5.9</u> and shall have the right, power and authority to enforce the provisions of this <u>Section 5.9</u> as though they were a party to this Agreement.

5.10    <u>Right to Conduct Activities</u>. The Company hereby agrees and acknowledges that AnuPriya LLC (together with its Affiliates) is a professional investment organization, and as such reviews the business plans and related proprietary information of many enterprises, some of which may compete directly or indirectly with the Company's business (as currently conducted or as currently propose to be conducted). Nothing in this Agreement shall preclude or in any way restrict the Investors from evaluating or purchasing securities, including publicly traded securities, of a particular enterprise, or investing or participating in any particular enterprise whether or not such enterprise has products or services which compete with those of the Company; and the Company hereby agrees that, to the extent permitted under applicable law, AnuPriya LLC (and its Affiliates) shall not be liable to the Company for any claim arising out of, or based upon, (i) the investment by AnuPriya LLC (or its Affiliates) in any entity competitive with the Company, or (ii) actions taken by any partner, officer, employee or other representative of AnuPriya LLC (or its Affiliates) to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; <u>provided</u>, <u>however</u>, that the foregoing shall not relieve (x)

any of the Investors from liability associated with the unauthorized disclosure of the Company's confidential information obtained pursuant to this Agreement, or (y) any director or officer of the Company from any liability associated with his or her fiduciary duties to the Company.

5.11    <u>Termination of Covenants</u>. The covenants set forth in this <u>Section 5</u>, except for <u>Sections 5.7</u>, <u>5.8</u> and <u>5.9</u>, shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, or (ii) upon a Deemed Liquidation Event, as such term is defined in the Articles of Incorporation, whichever event occurs first.

6.    <u>Miscellaneous</u>.

6.1    <u>Successors and Assigns</u>. The rights under this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee of Registrable Securities that (i) is an Affiliate of a Holder; (ii) is a Holder's Immediate Family Member or trust for the benefit of an individual Holder or one (1) or more of such Holder's Immediate Family Members; or (iii) after such transfer, holds at least 100,000 shares of Registrable Securities (subject to appropriate adjustment for share splits, share dividends, combinations, and other recapitalizations) together with its Affiliates, would be a Major Investor; <u>provided</u>, <u>however</u>, that (x) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; and (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement, including the provisions of <u>Section 2.11</u>. For the purposes of determining the number of shares of Registrable Securities held by a transferee, the holdings of a transferee (1) that is an Affiliate or shareholder of a Holder; (2) who is a Holder's Immediate Family Member; or (3) that is a trust for the benefit of an individual Holder or such Holder's Immediate Family Member shall be aggregated together and with those of the transferring Holder; <u>provided</u> <u>further</u> that all transferees who would not qualify individually for assignment of rights shall, as a condition to the applicable transfer, establish a single attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.2    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of California, without regard to conflict of law principles that would result in the application of any law other than the law of the State of California.

6.3    <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.4    <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5    <u>Notices</u>.

(a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on <u>Schedule A</u>  hereto, or (as to the Company) to the principal office of the Company and to the attention of the Chief Executive Officer, or in any case to such email address or address as subsequently modified by written notice given in accordance with this <u>Section 6.5</u>. If notice is given to the Company, a copy (which copy shall not constitute notice) shall also be sent to Attn: Anil Advani, Esq., Inventus Law, PC., 3260 Hillview Avenue, Palo Alto, California 94304 and if notice is given to Investors, a copy (which copy shall not constitute notice) shall also be given to Keating Muething & Klekamp PLL, One East Fourth Street, Suite 1400, Cincinnati, Ohio 45202, Attention: Michael J. Moeddel, Email: mmoeddel@kmklaw.com.

(b)    <u>Consent to Electronic Notice</u>. Each Investor consents to the delivery of any shareholder notice pursuant to the California Corporations Code (the "**CCC**"), as amended or superseded from time to time, by electronic transmission pursuant to Section 601(b) of the CCC (or any successor thereto) at the electronic mail address set forth below such Investor's name on the Schedules hereto, as updated from time to time by notice to the Company, or as on the books of the Company. To the extent that any notice given by means of electronic transmission is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted electronic notice shall be ineffective and deemed to not have been given. Each Investor agrees to promptly notify the Company of any change in such shareholder's electronic mail address, and that failure to do so shall not affect the foregoing.

6.6    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended, modified or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the holders of at least a majority of the Registrable Securities then outstanding; <u>provided</u> that the Company may in its sole discretion waive compliance with <u>Section 2.12(c)</u> (and the Company's failure to object promptly in writing after notification of a proposed assignment allegedly in violation of <u>Section 2.12(c)</u> shall be deemed to be a waiver); and <u>provided</u> <u>further</u> that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. Notwithstanding the foregoing, (a) this Agreement may not be amended, modified or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, modification, termination, or waiver applies to all Investors in the same fashion (it being agreed

23

that a waiver of the provisions of <u>Section 4</u> with respect to a particular transaction shall be deemed to apply to all Investors in the same fashion if such waiver does so by its terms, notwithstanding the fact that certain Investors may nonetheless, by agreement with the Company, purchase securities in such transaction) and (b) <u>Sections 3.1</u> and <u>Section 4</u> and any other section of this Agreement applicable to the Major Investors (including this <u>clause (b)</u> of this <u>Section 6.6</u>) may be amended, modified, terminated or waived with only the written consent of the Company and the holders of at least a majority of the Registrable Securities then outstanding and held by the Major Investors. Notwithstanding the foregoing, <u>Schedule A</u> hereto may be amended by the Company from time to time to add transferees of any Registrable Securities in compliance with the terms of this Agreement without the consent of the other parties; and <u>Schedule A</u> hereto may also be amended by the Company after the date of this Agreement without the consent of the other parties to add information regarding any additional Investor who becomes a party to this Agreement in accordance with <u>Section 6.9</u>. The Company shall give prompt notice of any amendment, modification or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, modification, termination, or waiver. Any amendment, modification, termination, or waiver effected in accordance with this <u>Section 6.6</u> shall be binding on all parties hereto, regardless of whether any such party has consented thereto. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one (1) or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

6.7     <u>Severability</u>. In case any one (1) or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

6.8     <u>Aggregation of Shares; Apportionment</u>. All shares of Registrable Securities held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliated Persons may apportion such rights as among themselves in any manner they deem appropriate.

6.9     <u>Additional Investors</u>. Notwithstanding anything to the contrary contained herein, if the Company issues additional Preferred Shares after the date hereof, any purchaser of such shares of Preferred Shares may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed an "Investor" for all purposes hereunder. No action or consent by the Investors shall be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

6.10    <u>Entire Agreement</u>. This Agreement (including any Schedules hereto) together with the other Transaction Documents (as defined in the Purchase Agreement), constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

6.11    <u>Dispute Resolution</u>. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Ohio and California and to the jurisdiction of the United States District Court for the Southern District of Ohio and the United States District Court for the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Ohio or California or the United States District Court for the Southern District of Ohio or the United State District Court for the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

6.12    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or non-defaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Investors' Rights Agreement as of the date first written above.

**COMPANY:**

**NESTLINGS INC**

By: _Sowmya Arsikere Satish_

Name: Sowmya Arsikere Satish

Title:  Chief Executive Officer

IN WITNESS WHEREOF, the parties have executed this Investors' Rights Agreement as of the date first written above.

**INVESTORS:**

**ANUPRIYA LLC**


By: _____

Name: Anushree M. Vora

Title:  Manager

## SCHEDULE A

**INVESTORS**

**Name and Address**

AnuPriya LLC
10290 Alliance Road
Cincinnati, OH 45242
Attn: Anushree M. Vora
Email: avora@voraventures.com

Cc:    Keating Muething & Klekamp PLL
    One East Fourth Street, Suite 1400
    Cincinnati, Ohio 45202
    Attention: Michael J. Moeddel
    Email: mmoeddel@kmklaw.com.

## ANNEX 1

## CERTIFICATE OF QUALIFIED SMALL BUSINESS STOCK

Nestlings Inc, a California corporation (the "**Company**") hereby provides the following information to the stockholder(s) named in the table below (the "**Stockholders**") to assist in their determination of whether the Stockholders(s) may be entitled to certain tax benefits associated with "qualified small business stock" (QSBS) pursuant to Sections 1045 and 1202 of the Internal Revenue Code of 1986, as amended, in connection with the following securities of the Company purchased by the Stockholder(s):

| Stockholder | Class/ Type of Stock | Issue Date | Stock [Certificate/Issuance] Number | Number of Shares |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| Corporate Level Requirements | Yes | No | NA |
|---|---|---|---|
| l. Was the Company a "qualified small business" on each Issue Date? |  |  |  |
| • Is the Company a domestic C corporation? | ☐ | ☐ | ☐ |
| • Were the Company's aggregate gross assets equal to $50 million or less as of the Issue Date and immediately thereafter?<br>=> Aggregate gross assets shall include cash and the adjusted tax basis of the Company's other property.<br>=> All corporations in the same parent-subsidiary control group (defined as more than fifty percent (50%) owned) are treated as one corporation.<br>=> The adjusted basis of contributed property does not include any built-in gain at the time of contribution. | ☐ | ☐ | ☐ |
| • Does the Company agree to any IRS requirements for reporting to the Internal Revenue Service and Stockholders? | ☐ | ☐ | ☐ |
| 2.  Is the Company engaged in a "qualified trade or business |  |  |  |
| • Is the Company engaged in a business *other than* the performance of personal services, banking, insurance, financing, leasing, investing, farming, extracting or producing natural resources, or operating of a hotel, restaurant, or similar business? | ☐ | ☐ | ☐ |
| 3.  Is the Company an "eligible corporation"? |  |  |  |
| • Is the Company other than a DISC, a former DISC, a § 936 corporation, a corporation with a § 936 subsidiary, a RIC, a REIT, a REMIC, FASIT, or a cooperative? | ☐ | ☐ | ☐ |
| 4.a. Was the Company engaged in an "active business" for substantially all of the taxpayer's holding period? |  |  |  |

| Corporate Level Requirements | Yes | No | NA |
|---|:---:|:---:|:---:|
| • Were at least eighty percent (80%) of the value of the assets of the "eligible corporation" used in the conduct of "qualified trades or businesses"?<br><br>=> If the Company is less than two years old, does the Company meet the eighty percent (80%) test with assets (1) reasonably required for the working capital needs of the business, or (2) reasonably expected to be used within two (2) years to finance research or fund increases in working capital needs? **OR**,<br><br>=> If the Company is two (2) or more years old, does "working capital" constitute fifty percent (50%) or less of the corporation's assets for purposes of the eighty percent (80%) test? | ☐ | ☐ | ☐ |
| • For all periods did the Company have less than ten percent (10%) of the value of its net assets consisting of stock or securities in other corporations which are not subsidiaries? | ☐ | ☐ | ☐ |
| • For all periods did the Company have less than ten percent (10%) of the value of its assets in real property not being used in the active conduct of a qualified business? | ☐ | ☐ | ☐ |
| 4.b. **OR** if the "active business" requirement (#4.a.) was not met, was the Company a "specialized small business investment company" licensed to operate under Section 301(d) of the Small Business Act of 1958? | ☐ | ☐ | ☐ |
| 5. Did the Company avoid redeeming stock from the taxpayer (or a related party) two (2) years before or after the Issue Date of the stock in question? | ☐ | ☐ | ☐ |
| 6. Did the Company avoid redeeming the stock worth more than five percent (5%) of the total value of the Company one (1) year before or after the Issue Date of the stock in question? | ☐ | ☐ | ☐ |

IN WITNESS WHEREOF, the Company has executed this Certificate on [*Date*].

**NESTLINGS INC**

By: _____

Name: _____

Title: _____